UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

*Courtesy Copy*
DO NOT SCAN

| | |
|---|---|
| KENNETH ADAMSON<br>Plaintiff<br><br>v.<br><br>WYETH PHARMACEUTICALS f/n/a<br>WYETH-AYERST PHARMACEUTICALS<br>and ROBERT WINTERS<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.: 04-C V-11623-DPW |

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 56.1, Defendants Wyeth Pharmaceuticals ("Wyeth" or the "Company") and Robert Winters ("Winters") (collectively the "Defendants") submit this statement of the material facts as to which there is no genuine issue to be tried in connection with their Motion for Summary Judgment on the Amended Complaint filed by the Plaintiff Kenneth Adamson ("Adamson" or "Plaintiff"), which is being filed simultaneously herewith. The undisputed facts are:

**The Parties**

1.  Wyeth is a pharmaceutical company in the business of researching, developing, manufacturing and selling prescription pharmaceuticals. (Amended Complaint ¶3; Deposition of Carmen Boswell ("Boswell Tr.") at 25:20-23, 30:5-11).

2.  Employed by Wyeth (or its predecessors) since 1981, Winters is an Area Business Director for Wyeth, and at all times relevant to the allegations in the Amended Complaint herein,

was the Area Business Director for Area 11.[1/]  (Amended Compliant ¶4; Winters Ex. 1 at 14:6-13, 24:15;[2/] Boswell Tr. at 78:19-23)

3.  Area 11 is comprised of Massachusetts, New Hampshire, Rhode Island, Vermont and Maine, and is part of Wyeth's Zone 1, a geographic territory that covers most of the northeast and mid-Atlantic regions of the United States.  (Winters Ex. 1 at 25:25-26:8, 70:20-23; Deposition of Sandra Close ("Close Tr.") at 43:19-24; Boswell Tr. at 74:3-18).

4.  As Area Business Director, Winters was in charge of achieving the Company's sales goals in Area 11 and overseeing the Area's sales related positions:  District Managers, Territory Representatives, Psychiatric Specialty Managers and Area Account Managers.  (Winters Ex. 1 at 24:16-25:16; Deposition of Claudia Diotalevi ("Diotalevi Tr.") at 21:22-22:12).

5.  District Managers are the next in command under Winters, followed by Area Account Managers, and Psychiatric Specialty Managers.  (Winters Ex. 1 at 24:16-25:16).

6.  Territory Representatives, at the lowest level, are the equivalent of pharmaceutical sales representatives and comprise the majority of the sales force.  (Winters Ex. 1 at 21:2-5; Diotalevi Tr. at 8:1-11).

7.  Adamson is an employee of Innovex Corporation, which provides pharmaceutical companies like Wyeth with a supplemental sales force to promote its products.  (Amended

---

[1/]     In January 2005, in conjunction with a company-wide reorganization of Area Business Directors, Winters was reassigned to Area 15, a territory comprised of Pennsylvania (with the exception of Philadelphia) and West Virginia. (Deposition of Robert Winters ("Winters Tr.") at 178:17-24, 181:10-182:3).
[2/]     The deposition of Defendant Robert Winters taken at the MCAD proceedings in this matter was introduced as Exhibit 1 at Mr. Winters' deposition herein.  Therefore, all references to Mr. Winters' testimony in the MCAD proceedings will be in the form of "Winters Ex. 1 at _____:_____."  All references to the deposition of Robert Winters in this litigation will be "Winters Tr. _____."

Complaint ¶ 8; Plaintiff's ("Pl.") Ex. 1 at 35:3-8;[3/] Deposition of Kenneth Adamson ("Adamson Tr.") at 101:11-13).

8. Innovex provided Wyeth with a supplemental sales force, via contractual arrangement, for the marketing and sale of pharmaceutical drugs for the time period of January 1, 1999 - December 31, 2001. (Winters Ex. 1 at 44:2-9; Winters Ex. 58).

9. Beginning in 1999, Adamson was assigned by Innovex to work on the Wyeth contract, first as a Territory Representative, and then as a District Manager beginning in February 2000. (Pl. Ex. 1 at 35:3-8; Winters Ex. 1 at 45:10-46:11; Diotalevi Tr. at 59:24-60:16; Pl. Ex. 15).

10. Carl Buschmann, an Innovex Regional Sales Manager, was Plaintiff's direct supervisor while he was assigned to the Wyeth contract. (Adamson Tr. at 69:10-11; Pl. Ex. 1 at 34:18-35:13, 98:21-34; Amended Complaint ¶ 9; Winters Ex. 1 at 38:25-39:1).

11. Plaintiff was never employed by Wyeth. Innovex handled all aspects of hiring, firing and the disciplinary action process for its employees, including Adamson: (1) Innovex (not Wyeth) hired Adamson; (2) Adamson received performance evaluations solely from Innovex management on an annual basis; and (3) Innovex was responsible for Adamson's compensation (salary, merit increases, W-2 and bonuses) and benefits package. (Deposition of Carl Buschmann ("Buschmann Tr.") at 61:4-14, 77:6-12, 142:3-144:18; Amended Complaint ¶8).

**Procedural History**

12. Adamson initiated the underlying action by filing a Charge with the MCAD on April 24, 2002. (Amended Complaint ¶22; Adamson Ex. 1[4/]).

---

[3/]    Adamson was deposed in two sessions (August 26, 2003 and September 2, 2003), while this matter was pending at the Massachusetts Commission Against Discrimination ("MCAD"). The transcripts from that deposition were introduced at the deposition herein, and marked as "Plaintiff's Exhibit 1." Therefore, all references to Mr. Adamson's testimony provided in the MCAD proceedings will be in the form of "Pl. Ex. 1 at ____: ____." All references to the deposition of Kenneth Adamson in this litigation will be "Adamson Tr. ___."

13. Adamson filed a Complaint on June 22, 2004 in the Superior Court of Massachusetts, Middlesex County. (Commonwealth of Massachusetts, Middlesex Superior Court, No, 04-1213).

14. Defendants subsequently removed the matter to this Court on July 21, 2004. (Notice, Dated: July 21, 2004).

15. The Complaint herein, similar to the Charge below, alleges that Wyeth and/or Winters discriminatorily failed to hire Plaintiff for a "permanent managerial or other suitable professional position" for reasons relating solely to his race and color. (Amended Complaint ¶ 1).

16. Following dismissal of Plaintiff's retaliation claim, Plaintiff filed a First Amended Complaint on September 8, 2004. (Amended Complaint).

**Wyeth's Anti-Discrimination and Anti-Harassment Policies**

17. Wyeth is focused upon strict compliance with its anti-discrimination and anti-harassment policies, which contain the following key elements:

- The Company provides equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex, sexual orientation, national origin, age, disability, status as a Vietnam-era veteran or special disabled veteran, or any military uniformed services obligation. In carrying out this policy, the Company will comply with all applicable federal, state and local laws governing non-discrimination. This policy applies to all terms and conditions of employment, including, but not limited to employment, upgrading, transfer, recruitment advertising, recruitment selection, placement, promotion, demotion, layoff, compensation, benefits, training, termination, and educational assistance. (Boswell Ex. 4).

- The Company is committed to ensuring that all employees and applicants are entitled to respect and a workplace free from discrimination, regardless of his/her race, color, religion, sex, sexual orientation, national origin, age,

---

4/    Exhibits identified as "Adamson Ex._____" are exhibits that were introduced into evidence at Adamson's deposition, conducted in two sessions (August 26, 2003 and September 2, 2003), while this matter was pending at the Massachusetts Commission Against Discrimination.

disability, veteran status, citizenship, or any other characteristic protected by law. In keeping with this commitment, Wyeth maintains a strict policy prohibiting discriminatory harassment of any kind, including sexual harassment. (Boswell Ex. 3).

- The Company makes efforts to recruit qualified or qualifiable applicants who are minorities, females, individuals with disabilities, veterans of the Vietnam-era or special disabled veterans. (Boswell Ex. 4).

18. Wyeth's anti-discrimination policies include a definition of discrimination with real-life examples; non-retaliation language for employees who report instances of discrimination; and a statement that discriminatory conduct will result in disciplinary action to the offender, up to and including dismissal. (Boswell Tr. at 106:18-107:23; Boswell Ex. 3, 4 and 6).

19. These policies are well publicized and provide employees various avenues to pursue workplace complaints. (Boswell Tr. 19:22-20:8, 26:3-7, 68:13-19, 106:21-108:23, 113:16-114:5; Deposition of Eugene Sackett ("Sackett Tr.") at 14:21-15:19; Winters Ex. 1 at 148:15-149:25).

20. Wyeth encourages employees to report any offensive conduct to their supervisors, and the Company thoroughly investigates all complaints of discrimination or harassment. (Boswell Tr. 26:3-7, 68:13-19; Sackett Tr. 14:21-15:19; Boswell Ex. 3, 4, 6 and 7).

**Recruitment at Wyeth**

21. Wyeth takes recruiting and diversity seriously and expends significant resources training its employees on effective interviewing and recruiting the most qualified candidates of all backgrounds. (Close Tr. 22:4-15, 23:5-22, 31:18-32:13, 35:9-15, 57:17-24; Close Ex. 3 and 4; Sackett Tr. at 48:15-50:17, 64:21-65:12; Sackett Ex. 3).

22. In fact, Wyeth Field Sales Managers are put through an interview training process that teaches employees how to effectively interview candidates by way of the "Targeted Selection" interview method. (Close Tr. at 31:20-33:2; Sackett Tr. at 74:6-14).

23. Minority candidates for field sales positions are identified and recruited by Wyeth via the utilization of specific job fairs, advertisements and referral programs. (Close Tr. at 22:1-23:22; Winters Ex. 1 at 96:4-10; Sackett Tr. at 49:24-50:17, 64:21-65:12; Close Ex. 3 and 4; Sackett Ex. 3).

24. When recruiting for sales management positions, Defendants will look first to internal candidates as there is an emphasis at Wyeth on providing existing employees with ample promotion opportunities. (Close Tr. at 13:17-14:3, 49:10-17, 61:13-16, 72:4-8; Sackett Tr. at 66:21-24).

25. Wyeth has its own Strategic Staffing Department which employs a database called "Resumix" to develop and maintain a ready pool of applicants for its many job openings. (Close Tr. at 22:7-15, 31:8-14, 49:7-9, 82:24-83:6).

**Hiring for Marketing Positions**

26. Interviews are scheduled by Wyeth's Strategic Staffing Department. (Affidavit of Nick Marmontello ("Marmontello Aff.") ¶7; Amended Complaint ¶16).

27. Candidates must meet with two levels of management. (Marmontello Aff. ¶7).

28. In the case of candidates for Area Marketing positions in Philadelphia, they would be brought in to meet with the Assistant Vice President they would be reporting to, and that individual's supervisor. (Marmontello Aff. ¶7).

29. At no time would an Area Marketing candidate meet with or be approved by an Area Business Director, such as Winters. (Marmontello Aff. ¶14).

30. In fact, Wyeth's Business Planning & Analysis Department is solely responsible for the recruitment and hiring of its supervisors and marketing staff. (Marmontello Aff. ¶¶6, 7).

**Hiring for Territory Representatives**

31. Recruiting for the Territory Representative ("Representative") positions is handled by Wyeth's Strategic Staffing Department. (Winters Tr. at 20:16-22:4; Close Tr. at 21:11-15; Sackett Ex. 3 at Wyeth 02788-02789).

32. Territory Representatives are also screened by telephone by Wyeth's Strategic Staffing Department and, if qualified, their resumes are passed on to District Managers who may contact them for an interview. (Close Tr. at 61:10-62:1, 68:2-11; Winters Ex. 27; Sackett Ex. 3 at Wyeth 02788-02789).

33. In Area 11, a second interview is frequently scheduled with another District Manager in the same Wyeth sales territory ("Area"). (Close Tr. at 55:24-56:3; Winters Ex. 27; Affidavit of Margaret Glassman ("Glassman Aff.") at ¶¶3, 4).

34. This second interview involves a more in-depth review of the candidate's prior work experience, career goals, sales experience, history of sales performance, assessment of industry knowledge, interest in Wyeth and overall professional demeanor of the candidate. (Close Tr. at 74:17-75:2; Diotalevi Tr. at 34:13-35:15, 43:15-23)

35. If both District Managers agree on the candidate's worthiness for the position then the candidate will be referred to the Area Business Director for a third and final interview. (Winters Tr. at 19:14-21; Winters Ex. 27; Sackett Ex. 3 at Wyeth 02788-02789).

36. It is at the District Manager's sole discretion whether to refer a candidate for a final interview with the Area Business Director. (Diotalevi Tr. at 71:2-13).

37. Area Business Directors such as Winters would have no knowledge of a Territory Representative candidate unless they were recommended to him for a final interview. (Winters Tr. at 19:14-21; Diotalevi Tr. at 70:8-71:6).

**Hiring for District Manager Positions**

38. As a general rule, Wyeth management will initially attempt to recruit internal candidates for open positions. (Winters Tr. at 70:11-71:1, 145:14-17; Close Tr. at 13:21-14:3, 49:10-17, 61:13-16, 72:4-8; Sackett Tr. at 66:21-24).

39. Area Business Directors are responsible for interviewing District Manager candidates. (Winters Ex. 3).

40. The Area Business Director must grant final approval before an employment offer is made to a District Manager candidate for his/her specific sales territory. (Winters Ex. 3).

**The Wyeth/Innovex Sales Contract**

41. Wyeth engaged Innovex to provide a contingent sales force for assistance in selling and marketing certain of its pharmaceutical products from January 1999 - December 2001. (Deposition of John Lauer ("Lauer Tr.") at 13:21-14:13; Buschmann Tr. at 10:19-11:6, 11:20-12:1, 13:5-18; Winters Ex. 58).

42. This contingent sales force, of which Plaintiff was a part, worked alongside the Wyeth sales divisions in each Area and promoted Wyeth's products under Wyeth's direction. (Winters Ex. 1 at 32:4-33:14, 156:18-25).

43. Pursuant to the Innovex/Wyeth contract, Innovex Representatives and District Managers were expected to completely support the product promotion of Wyeth's products by adhering to Wyeth's sales and promotion practices as expected of Wyeth employees in the Area that they supported. Innovex sales people were provided with training on Wyeth's products and received the same marketing, sales guidance and objectives as did Wyeth employees. (Lauer Tr. at 16:12-18:5).

8

44. Innovex Representatives and District Managers were invited and expected to attend and participate in Wyeth sales meetings. (Winters Ex. 1 at 32:4-33:14, 161:8-10, 209:14-18, 210:21-211:2; Adamson Tr. at 67:16-68:3).

45. Innovex employees assigned to the Wyeth contract were also expected to maintain regular communication with Wyeth managers. (Winters Ex. 1 at 33:14-18, 237:13-238:5; Buschmann Tr. at 109:2-9, 114:23-116:25; Adamson Tr. at 128:5-129:8, 131:6-132:18).

46. However, matters of discipline, performance reviews, compensation and other terms and conditions of employment were left exclusively to Innovex as the employer. (Buschmann Tr. at 61:4-14, 77:6-12, 142:3-144:18).

47. Finally, prior to placement on the Wyeth contract, Innovex arranged for their District Managers to meet with the Wyeth Area Business Directors ("ABDs") they would be working with on the contract. The ABDs had no decision-making authority over Innovex's hiring or other employment decisions. Rather, Wyeth ABDs had the ability to express any concerns he/she may have had about the District Manager's assignment to the Wyeth contract. (Winters Ex. 1 at 45:4-46:21, 54:23-55:4; Winters Tr. at 80:4-13).

48. These candidates were not being hired by Wyeth, only assigned by Innovex to service the Wyeth account as an Innovex District Manager. As a result, these individuals were not evaluated under the same criteria and level of scrutiny as an individual being considered for employment with Wyeth. (Winters Ex. 1 at 51:18-52:19, 53:21-55:7).

**Plaintiff's Allegations of Purported Discrimination**

The Pharmaceutical Territory Representative Position.[5/]

49. Plaintiff applied for a "Pharmaceutical Representative" position at Wyeth. (Amended Complaint ¶ 7; Adamson Tr. at 52:10-19; Winters Ex. 1 at 120:2-5; Glassman Aff. ¶3).

50. Plaintiff was interviewed for this position by Claudia Diotalevi and Margaret Glassman. (Adamson Tr. at 52:10-19; Winters Ex. 1 at 120:2-5; Diotalevi Tr. at 25:8-17, 41:8-13, 55:22-56:3; Glassman Aff. ¶3).

51. Adamson's interview demeanor was arrogant and offensive. During his interview, Adamson was generally unimpressive, unenthusiastic, non-responsive, and he became defensive when asked about his employment with Merck, his only relevant work experience. This concerned Diotalevi and Glassman because his decision to leave Merck only to seek to the same position at Wyeth seemed like an unusual career choice and a potential "red flag." (Diotalevi Tr. at 41:17-22, 56:21-57:11; Glassman Aff. ¶¶ 6, 7, and 8).

52. Adamson was subsequently rejected for the position. (Diotalevi Tr. at 43:24-44:4; Adamson Tr. at 57:2-4; Glassman Aff. ¶9).

53. Diotalevi and Glassman offered unrebutted testimony that race did not play a factor in the decision not to hire Adamson. (Diotalevi Tr. at 56:10-57:7; Glassman Aff. ¶11; Adamson Tr. at 145:13-17).

54. Because Plaintiff was never presented to Winters after the interview by Diotalevi, Winters was never aware of Plaintiff's candidacy until this case was filed. (Winters Ex. 1 at 120:2-5; Glassman Aff. ¶9; Diotalevi Tr. at 70:8-71:6).

---

[5/]    While Wyeth disputes that this interview occurred in 1998, for the purposes of this motion only, Defendants will rely on Plaintiff's allegation as true.

55. Winters played no role in the decision to reject Plaintiff for this position. (Diotalevi Tr. at 43:24-44:8, 55:13-16, 58:8-18, 70:8-71:13).

56. In fact, Adamson's pursuit of this position pre-dated Adamson's employment with Innovex and subsequent assignment to the Wyeth contract. (Pl. Ex. 1 at 13:19-22; 17:3-11; Adamson Tr. at 55:4-10).

57. Adamson and Winters did not meet until Adamson was assigned to the Wyeth contract. (Winters Ex. 1 at 50:7-58:18; Adamson Tr. at 75:11-13).

58. Adamson has no knowledge or facts that support his assertion that Winters was involved in this decision. (Pl. Ex. 1 at 18:16-20; Adamson Tr. at 51:13-53:1).

> Q:    --do you have any facts to show that Mr. Winters had any involvement in your application for a pharmaceutical position back at that time?
>
> A:    No. (Pl. Ex. 1 at 18:16-20).
>
> *    *    *
>
> Q:    Halfway down that page you make the statement quote, "Was this Mr. Winters' decision?" end quote, right?
>
> A:    Yes.
>
> Q:    Based upon that statement, is it fair to say that you were unsure about what, if any, involvement Mr. Winters had with respect to the hiring for that position back in 1999?
>
> A:    Yes. (Adamson Tr. 51:13-21).

59. Plaintiff does not know who was hired for the 1998 Representative position, or for that matter, the individual's race.

> Q:    The question is, do you know who was hired for that position?
>
> A:    No, I don't know specifically who was hired for the position I interviewed for. (Adamson Tr. at 142:17-20).
>
> *    *    *

> Q:    That's not my question.  My question is, do you know who was
>        hired - did you ever determine who actually was hired for the
>        position that you interviewed for?
>
> A:    I said "no."  (Adamson Tr. at 145:13-17).

60. Finally, Adamson does not know the qualifications of the person who was hired for

the 1998 Representative position.  (Adamson Tr. at 145:13-17).

61. Plaintiff *assumes*, but does not know, that the person who was hired for the 1998

Representative position has inferior qualifications:

> Q:    The question is, do you know who was hired for that position?
>
> A:    No, I don't know specifically who was hired for the position that I
>        interviewed for.
>
> Q:    So that assertion that Defendants hired Caucasian candidates with
>        qualifications inferior to yours can't apply to that position that you
>        interviewed for, since you don't know who was hired for that
>        position?
>
> A:    Well, to the best of my recollection, I was talking regularly with
>        people about the qualifications of representatives that were
>        working in my hometown area.  And Claudia Diotalevi had a
>        number of people around southern New England, which is pretty
>        small, and I remember observing that likely the people who would
>        have been hired in place of me, my recollection was that all of
>        them were less qualified than me.  That's my recollection.  Now, I
>        could be wrong on that.  But my recollection is that there was no
>        one with 11 years of experience selling the particular products that
>        Wyeth would be promoting.  (Adamson Tr. at 142:17-143:14).

The March 2001 District Manager Openings.

62. In March 2001, about three years after his first allegation, Plaintiff alleges that he was

not informed of possible District Manager openings by Wyeth or his actual employer, Innovex.

(Adamson Tr. at 48:8-24, Amended Complaint ¶12).

63. The positions, four (4) in total, arose as the result of a field sales expansion initiated by Wyeth in late-February 2001. (Winters Ex. 1 at 26:19-24, 66:2-5; Adamson Tr. at 49:14-17, 82:18-24, 148:14-17).

64. Pursuant to past practice, Winters first searched for candidates internally and, as a result, interviewed William Massar and Oliver Konarkowsk, both of whom were Wyeth employees. Based on their respective qualifications, Winters hired both Massar and Konarkowski for the positions. (Adamson Tr. at 49:1-10, 148:14-21; Winters Ex. 1 at 66:23-67:1).

65. Winters still had two open positions remaining. (Adamson Tr. at 49:8-10; Winters Tr. at 70:11-72:21; Winters Ex. 1 at 66:23-67:1).

66. At a meeting of Area Business Directors, Winters' boss, Dan Shepherd, solicited recommendations of candidates from other Area Business Directors. (Winters Tr. at 70:11-72:21; Winters Ex. 1 at 67:23-69:3).

67. Roy Hammac recommended Patrick Daly and William McElroy recommended Peter Rzewnicki. Both Daly and Rzewnicki were Innovex District Managers. (Winters Tr. at 70:11-72:21; Winters Ex. 1 at 69:4-5).

68. Daly and Rzewnicki were the only candidates recommended during this meeting. (Winters Tr. at 70:11-72:21; Winters Ex. 1 at 68:12-69:3).

69. Winters accepted the two suggestions (Daly and Rzewnicki) and contacted their boss, Innovex Regional Sales Manager Carl Buschmann ("Buschmann") -- who also happened to be Adasmon's boss -- to determine if they would be interested in opportunities at Wyeth. Daly and Rzewnicki expressed interest and interviews were scheduled shortly thereafter. (Deposition of

Peter Rzewnicki ("Rzewnicki Tr.") at 29:13-24; Amended Complaint ¶ 9; Winters Tr. at 70:11-
72:21; Deposition of Patrick Daly ("Daly Tr.") at 64:14-65:2; Winters Ex. 1 at 69:8-16).

70. Adamson was not recommended by any of the Area Business Directors as a potential
candidate. (Winters Ex. 1 at 68:12-69:3; Winters Tr. at 70:11-72:21).

71. At the time, Winters believed Adamson was seeking a position as a District Manager
in Virginia, or an opportunity in marketing, pursuant to a conversation between Winters and
Adamson in early-February 2001, . (Winters Ex. 1 at 119:17-120:1, 271:11-22; Winters Tr. at
202:10-203:10; Pl. Ex. 1 at 58:19-59:20; Adamson Tr. at 205:3-6).

72. Buschmann, Adamson's boss, did not recommend Plaintiff for the positions, even
though Plaintiff alleged that Buschmann knew of his interest in a position at Wyeth. (Pl. Ex. 1 at
145:18-149:12; Adamson Tr. at 81:18-22; Amended Complaint ¶ 9; Winters Ex. 1 at 215:17-20;
Buschmann Tr. at 65:22-66:4).

73. Corroborating Winters' testimony, Buschmann testified that he believed that
Adamson was interested in either marketing positions or in District Manager positions *in other
locations* (outside of New England):

> Q:    Did you ever speak to anybody other than Mr. Winters about
>       exploring district manager positions at Wyeth for Mr. Adamson
>       between December, 2000--
>
> A:    Actually, I do recall. I do recall Ken and I had a conversation
>       about he had expressed, "You know what, there's some other
>       geographies that I might be interested in," and he had listed the
>       geographies that would have been -- because he had to have a
>       discussion with his wife about possible things because we had
>       discussed, you know, if you were to accept an offer and get
>       relocated to these areas, what would be the areas that you would
>       want to go to, and I did identify those areas, and I think Bob and I
>       talked about that at one point. I thought Virginia or someplace
>       down south stand out as being one. So, yeah I do recall that.
>
> Q:    And you spoke specifically with Mr. Winters about that?

A:    Yeah. I don't remember exactly when, but, yeah, Bob and I talked about Ken's potential interest in other opportunities. (Buschmann Tr. at 74:4-25).

\*    \*    \*

Q:    Sure. Is it your testimony, Mr. Buschmann, that today you don't recall whether or not Mr. Adamson applied for more than one available career opportunity at Wyeth?

A:    No.

Q:    Is it your testimony that he applied for more than one?

A:    I previously stated that he applied for the marketing position and had expressed interest in other opportunities at Wyeth on a relocatable [sic] basis I do recall discussions with Ken on both of those points. (Buschmann Tr. at 152:18-153:4).

74. When reviewing an unsigned draft affidavit purported to be from Buschmann and attached to Plaintiff's Initial Disclosures, Buschmann provided the following testimony (Buschmann Ex. 5):

Q:    No. Right before that, the sentence before in paragraph 9.

A:    "Mr. Adamson applied for several available career opportunities at Wyeth, including the district manager position which reported to Mr. Winters."

Q:    You testified that you don't recall that statement.

A:    I didn't recall interviewing for his district manager position. However, I do recall Ken's expressing interest in relocation opportunities as we later got to. So, you know, as we talked about it further, I did recall having those discussions. That would be the two. (Buschmann Tr. at 121:6-18).

75. Adamson also alleges that he and Carl Buschmann "confronted Mr. Winters on why he had not considered Plaintiff for these positions." (Amended Complaint ¶14). Contrary to the unsigned Buschmann affidavit that Plaintiff attached to his Disclosures pursuant to Local Rules 26.1(B) and 26.2(A), Buschmann disavowed ever having a conversation with Winters about the

March 2001 positions, stating: "I don't recall ever speaking to Mr. Winters about Ken being rejected." (Buschmann Tr. at 93:24-94:6; Buschmann Ex. 5, 6).

76. Carl Buschmann does not recall ever recommending Adamson for a District Manager slot:

> Q:  Did you recommend Mr. Adamson for the district manager position? Mr. Schroeder: Objection. Asked and answered for the second time.
>
> A:  I recommended him for the marketing position I recall, and for the district manager position I just don't recall whether I did or not. I can't remember. (Buschmann Tr. at 65:22-66:4).

77. Winters arranged for the interviews of Daly and Rzewnicki almost immediately, and they took place on March 2, 2001. (Rzewnicki Tr. at 29:13-30:18, 32:4-11; Winters Tr. at 73:3-20; Winters Ex. 1 at 69:13-22).

78. Rzewnicki telephoned Adamson, after his interview on March 2, 2001, later that same day, to find out if Adamson also interviewed for the position. (Rzewnicki Tr. at 40:3-11, 45:15-24; Adamson Tr. at 149:23-150:5).

79. During this call, Rzewnicki told Adamson about the position that Rzewnicki had interviewed for, and relayed his belief that Pat Daly was also being interviewed. (Rzewnicki Tr. at 45:15-46:18, 52:1-19; Adamson Tr. at 149:23-150:5)

80. Rzewnicki also told Adamson that he learned about the position through Carl Buschmann. (Rzewnicki Tr. at 53:11-19, 61:8-23).

81. Both Rzewnicki and Daly were offered the position (contingent on drug testing and background checks) shortly after the interviews. (Rzewnicki Tr. at 68:7-70:5; Winters Ex. 1 at 69:17-22; Winters Tr. at 73:8-14; Daly Tr. at 69:22-70:8).

82. The offers were accepted and the pre-employment process was well under way by mid-March, 2001. (Winters Ex. 1 at 69:17-22; Winters Tr. at 73:4-14; Rzewnicki Tr. at 68:7-70:5; Daly Tr. at 55:24-56:2; Winters Ex. 23 at Wyeth 01300-01304; Rzewnicki Ex.1).

83. Adamson claims he was required as part of his obligations to Wyeth under the Innovex contract to maintain at least weekly contact with Winters. (Pl. Ex. 2 at No. 3; Adamson Tr. at 128:5-129:8, 131:6-132:18).

84. Adamson did not contact either Winters or Buschmann before the jobs were offered to others to tell them that he was interested in the position. (Adamson Tr. at 150:16-151:2).

85. Adamson did not raise his interest in these District Manager positions until at least mid to late March, in a telephone conversation with Winters, at least several days after his telephone call with Rzewnicki:

> Q:    What specific date did you speak with Mr. Winters about the March 2001 expansion?
>
> A:    All I know it was mid-March, approximately mid-March. It was just a few days after I spoke with - it was probably less than a week after I spoke with Mr. Rzewnicki.
>
> Q:    You said you spoke to Mr. Rzewnicki early to mid-March. So if it was a week later than speaking to Mr. Rzewnicki, it had to be mid to late March, would you not agree?
>
> A:    I would agree. (Adamson Tr. at 150:16-151:2).

86. At that point, the positions had already been filled. (Pl. Ex. 1 at 160:4-23; Winters Tr. at 70:11-73:20; Rzewnicki Tr. at 68:7-70:5).

The Area Marketing Position:

87. Despite the absence of a District Manager interview, Adamson did interview for an Area Marketing position in March 2001 in Wyeth's Business Planning & Analysis Department, a position located in the Pennsylvania headquarters site of Wyeth Pharmaceuticals. (Amended

17

Complaint ¶ 16; Adamson Tr. at 58:6-21, 183:19-23; Pl. Ex. 1 at 151:6-152:1; Marmontello Aff. ¶6).

88. Adamson learned of the Area Marketing position because Winters informed him of possible openings that might interest him and offered his assistance. (Winters Tr. at 202:12-204:16). Winters forwarded to Adamson by email an internal listing stating:

> Ken, here is an opportunity we discussed recently. I would suggest you get Carl's support and have notification of your interest come from the Innovex channels. Let me know if I can help in any way? (Winters Ex. 33).

89. Adamson never responded to Winters and Winters never even knew he applied for the Area Marketing position until after the interview process was complete. (Winters Ex. 1 at 159:25-160:15).

90. At the time of Plaintiff's interview, there was not an actual Area Marketing position available. (Marmontello Aff. ¶¶5, 6).

91. Rather, candidates were interviewed on an almost continuous basis because this was a transitional position that people were often quickly promoted out of to other positions within the Company. (Marmontello Aff. at ¶5).

92. Relying upon inadmissible hearsay, Adamson opined that someone at Wyeth may have told someone at Innovex that Wyeth possibly had a position that they were looking to fill with an Innovex manager:

> Q:    Who do you believe at Wyeth treated you differently on the basis of your race in failing to hire you for that other marketing position?
>
> A:    I believe it would be whomever was involved in reviewing my qualifications and the specific individuals that spoke to Innovex about the opening and informed Innovex specifically that they were interested in hiring an Innovex manager for that position. (Adamson Tr. at 60:3-61:11).

93. Adamson interviewed with Matthew Dean, then the Assistant Vice President of Field Marketing, and Dean's direct boss, Nicholas Marmontello, then the Vice President, Business Planning and Development. (Adamson Tr. at 58:6-16; Winters Ex. 1 at 159:25-160:5; Marmontello Aff. ¶7).

94. When Marmontello questioned Adamson about his career path and his experience at Merck, Adamson became very defensive and volatile, going so far as to yell at Marmontello. (Marmontello Aff. ¶¶10, 11).

95. Adamson confirms that he does not know who was hired for that position, and by extension, the person's qualifications and minority status. (Adamson. Tr. at 63:14-64:1, 145:18-21; Pl. Ex. 1 at 154:5-6).

> Q:    Do you have any idea who was hired, if anyone, for that position?
>
> A:    I remember an announcement went out many months later.
>
> Q:    Do you know who that was?
>
> A:    No.
>
> Q:    Do you know anything about them?
>
> A:    No.  (Adamson Tr. 63:14-64:1).

96. While Adamson asserts that Winters was responsible for his failing to obtain an Area Marketing position, he admits his only "facts" are assumptions:

> Q:    Do you have any facts that -- what, if any facts can you point to that Mr. Winters had any involvement in the hiring process for the area marketing manager position?
>
> A:    Only assumptions.
>
> Q:    Other than assumptions.
>
> A:    None.  (Adamson Tr. at 61:12-61:18).

97. Winters was not involved in any way in the decision not to hire Plaintiff for the Area Marketing position. (Marmontello Aff. ¶14; Winters Ex. 1 at 159:25-166:5).

98. In November of that year, when two positions did become available, Adamson was not offered a job. (Amended Complaint ¶ 16; Marmontello Aff. ¶¶13, 14).

99. However, one of the two candidates hired at that time was African-American. (Marmontello Aff. ¶15).

100.    Additionally, only three (3) candidates have ever been hired into this position from outside the company. Of those three, two (2) were minority (African-American) candidates. (Marmontello Aff. ¶15).

The December 2001 District Manager Positions:

101.    In December 2001, two District Manager positions opened up in the Boston Area and Winters interviewed four candidates.[6] Kirk Buckner and Tom Duggan, who were already Wyeth managers, and both Innovex District Managers assigned to the Wyeth contract in that area, Kenneth Adamson and Stephen Arena. (Winters Tr. at 128:4-129:5).

102.    Wyeth deviated from its standard practice of not considering external candidates for management positions when it had qualified internal candidates in this instance because the Wyeth/Innovex contract was winding down and the terms of the contract required them to interview Innovex employees who wished to be interviewed for a Wyeth opening. (Winters Ex. 27; Pl. Ex. 1 at 161:18-24).

Kenneth Adamson

---

[6]    Winters testified that he may have interviewed Dave Johnson, also a Wyeth employee, because he knew that at some point Mr. Johnson was promoted to a District Manager position in Northern Maine. (Winters Tr. at 128:4-129:5).

103.    Adamson was interviewed for the December 2001 District Manager opening on November 14, 2001.  (Amended Complaint ¶18; Winters Tr. at 213:17-22, 229:19-230:3; Winters Ex. 53).

104.    Adamson was 1 of only 2 non-Wyeth candidates interviewed.  (Winters 127:17-128:19).

105.    During the interviews, Winters utilized a list of specific questions that had been designed to elicit information related to the candidates' skills and qualifications for the District Manager position.  (Pl. Ex. 1 at 169:18-170:15; Winters Tr. at 132:10-134:6, 138:11-14).

106.    Winters testified that he always writes out his questions prior to the interview to make sure that he covers the same subjects with every candidate and each interviewee has the opportunity to address the same general questions.  (Winters Tr. at 132:21-133:7).

107.    Winters took copious notes of his interview with Adamson.  (Winters Ex. 53, 56; Winters Tr. at 254:15-255:2).

108.    Adamson consistently gave answers to Winters' questions that were either not relevant to the District Manager position or were unimpressive.  (Winters Ex. 53, 56; Winters Ex. 1 at 207:13-208:7, 251:9-252:7).

109.    Adamson acknowledged that he talks about his musical talents and his creative abilities, clearly his true passion.  Winters did not feel Adamson's musical and creative talents made him a stronger candidate for the Wyeth District Manager position as compared to other candidates.  (Winters Ex. 1 at 207:13-208:7; Pl. Ex. 1 at 173:4-175:1; Adamson Ex. 11).

110.    Winters was extremely concerned that when asked what he looks for in a new hire Adamson identified someone who is in "good physical shape."  (Winters Tr. 253:4-9; Winters Ex. 53(16) and 56 (16)).

21

111.    Adamson testified that he has discussed physical fitness and appearance with candidates in interviews and received a warning from Innovex after a candidate complained that he had commented on her appearance during an interview. (Adamson Tr. at 190:7-193:23; Pl. Ex. 14).

112.    Most significantly, however, is that Adamson was unable to identify two important sales coaching principles that Area Business Directors and District Managers - including the Innovex District Managers who worked alongside Wyeth District Managers - had been asked to use by Wyeth's Zone 1 Vice President, Matthew Garrett. (Winters Ex. 1 at 170:19-171:2, 210:19-212:15; Winters Tr. at 124:16-23, 232:3-14; Winters Ex. 53 (19) and (20)).

113.    Garrett came on board as the Zone 1 Vice President in May 2001, at which point he became Winters' boss. (Winters Tr. at 117:12-19; Winters Ex. 53 (19) and (20); Winters Ex. 56 (19) and (20)).

114.    Garrett immediately implemented what he called the "Five Fundamentals" and "Four Attributes" and directed the Area Business Directors to instruct their District Managers to learn them and use them to coach the Territory Representatives. Winters reinforced these principles in meetings and numerous email communications. (Winters Tr. at 117:20-118:2, 120:23-122:8; Winters Ex. 1 at 211:3-15; Winters Ex. 37, 40).

115.    At the time of the November 2001 interview, Adamson should have been instructing his Territory Representatives on these principles for almost six months. (Winters Tr. at 117:20-118:2, 120:23-122:8)

116.    The Five Fundamentals are:

1.    Written itinerary to ensure targeting;
2.    Pre-call planning based on post-call notes;
3.    Know the literature;

    4.      Follow the POA; and

    5.      Close.  (Rzewnicki Tr. at 65:2-12; Winters Tr. at 123:8-14; Winters Ex. 56 (20)).

117.    The Four Attributes are:

    1.      Work Ethic;

    2.      Positive attitude;

    3.      Integrity; and

    4.      The Five Fundamentals.  (Winters Tr. at 123:16-18; Winters Ex. 56 (19)).

118.    It is undisputed that Plaintiff could not answer these questions correctly in his interview with Winters:

Q:    Do you recall not being able to answer the four attributes of the northeast zone?

A:    Yes.

Q:    Do you recall not being able to answer the five fundamentals of the northeast zone?

A:    Yes.

Q:    Saying you had them at home?

A:    Yes, yes, I do.  (Pl. Ex. 1 at 170:19-171:2).

119.    As reflected in Winters' notes, when asked to name the Four Attributes, Plaintiff replied: "Integrity, hard work, I know these are wrong but will say conduct, product knowledge, success."  (Winters Ex. 53 (19) and Ex. 56 (19)).

120.    As reflected in Winters' notes, when asked to name the Five Fundamentals, Adamson said that he had them written down at home, but then guessed "work hard, principles, fundamentals."  (Winters Ex. 53 (20) and 56 (20)).

23

121.    Based almost entirely on his performance during this interview, Winters decided not to offer Adamson the position of District Manager at Wyeth. (Winters Ex. 53, 56; Winters Tr. at 231:21-232:14; Winters Ex. 1 at 207:6-213:17).

122.    In early December 2001, Winters recommended that Adamson be considered for an Area Account Manager position, a lower level management position, and arranged for him to be interviewed. (Amended Complaint ¶19; Winters Ex. 1 at 213:18-214:6).

123.    Just one month prior, Adamson had expressed his interest in the Area Account Manager position to Sandy Close, Wyeth's Senior Strategic Staffing Representative, by letter dated November 14, 2001. (Pl. Ex. 6).

124.    Inexplicably, Adamson declined to be interviewed for the position. (Amended Complaint ¶21; Winters Tr. at 227:16-19; Winters Ex. 1 at 213:18-214:17).

Stephen Arena

125.    Arena is a Caucasian male. (Deposition of Stephen Arena ("Arena Tr.") at 9:8-10; Pl. Ex. 1 at 164:22-165:2).

126.    Arena was also an Innovex District Manager and had two years of management experience, more than Adamson. (Arena Ex. 1; Pl. Ex. 1 at 35:3-8, 164:22-165:2).

127.    Arena was also a graduate of Harvard University and possessed by far the most impressive academic credentials of the four candidates. (Arena Ex. 1).

128.    Arena, like Adamson, was also unable to name the Five Fundamentals and Four Attributes. (Winters Tr. at 231:21-232:14).

129.    Arena was not offered the District Manager position. (Winters Tr. at 231:21-24; Arena Tr. at 19:2-12; Pl. Ex. 1 at 165:6-8).

Other Allegations of Discrimination

130.    Two of Plaintiff's key witnesses, Buschmann and Leftridge, failed to sign affidavits generated by Plaintiff's counsel and contradicted key elements of those affidavits during their deposition.  (Buschmann Ex. 5 and 6; Leftridge Ex. 1; Leftridge Tr. at 32:3-7).

131.    Buschmann, who apparently received two versions of an affidavit from Plaintiff's counsel, refuted the following statements in his affidavit:

> A:    Point number 10, "On multiple occasions, Mr. Adamson spoke to me about his inability to secure permanent employment at Wyeth, despite his qualifications, and his concern that his race may be a factor.  In speaking to Mr. Winters about his rejecting Mr. Adamson for the district manager position, I do not recall Mr. Winters' reasons for overlooking," **and this assumes that I spoke to Mr. Winters and I do not recall my conversation with Mr. Winters about the actual interview.  So I don't recall that.** (emphasis added) (Buschmann Tr. at 90:24-91:9).

> *    *    *

> Q:    And if I can refer again your attention, Mr. Buschmann, to paragraph number 11.

> A:    Sure.  I was answering the question.  Yes.  Sure.  Let me point out the part that's incorrect here.  "On multiple occasions, Mr. Adamson spoke to me about his inability to secure permanent employment at Wyeth despite his qualifications, and his concern that his race may be a factor."  That is true.  We had several discussions around his frustrations on not being included in an opportunity at Wyeth.  That part is correct.

> Q:    Okay.

> A:    "In speaking to Mr. Winters about his rejecting Mr. Adamson", **that's incorrect.  I don't recall speaking to Mr. Winters about Ken being rejected.** (emphasis added).

>     I recall that Mr. Winters' reasons for overlooking Mr. Adamson seemed weak and implausible to me," **and I just don't recall that.** (emphasis added).  (Buschmann Tr. at 93:13-94:6).

> *    *    *

A:      "Mr. Adamson applied for several available career opportunities at Wyeth, including the district manager position which reported to Mr. Winters."

Q:      You testified today that you don't recall that statement.

A:      I didn't recall interviewing for his district manager position. However, I do recall Ken's expressing interest in relocation opportunities as we later got to. So, you know, as we talked about it further, I did recall having those discussions. That would be two. (Buschmann Tr. at 121:8-18).

\*       \*       \*

Q:      The statement, quote, "I recall that Mr. Winters' reasons for overlooking Mr. Adamson seemed weak and implausible to me," unquote, that is and inaccurate an incorrect [sic] statement?

A:      That is correct.

Q:      Because that did not happen, right?

A:      Correct. (Buschmann Tr. at 123:19-25).

132.    Adamson identified two other individuals who he maintains were victims of race discrimination at Wyeth: Fred Bigot and Douglas Leftridge. (Pl. Ex. 2 at No. 19).

133.    Bigot was a Haitian (black) candidate that Adamson put forth at Innovex to be assigned to the Wyeth contract. (Adamson Tr. at 17:3-18; Pl. Ex. 2 at No. 19).

134.    After interviewing Bigot, both Adamson and Brad Hardy, a Wyeth employee, had reservations. (Adamson Tr. at 17:19-18:9).

135.    Ultimately, after further investigation, Bigot was not hired. (Adamson Tr. at 26:7-8).

136.    Adamson testified that he assumed, but did not know for certain, that Winters was involved in the hiring process related to Bigot.

Q:      Do you know for a fact, other than your speculation, whether or not Mr. Winters was involved in the rejection of Mr. Bigot as a candidate?

26

A:    No, I don't. (Pl. Ex. 1 at 250:8-11).

\*    \*    \*

Q:    What's the basis for your belief that Mr. Winters had any
involvement in the hiring process related to Mr. Bigot?

A:    Mr. Winters is the No. 1 in command, so you do have to make
certain assumptions here that when it comes to who's going to be
working in his region, that he would have the final say when it
comes to a final interview.

**So I'm only assuming that Mr. Hardy discussed Mr. Bigot's
candidacy with Mr. Winters.** One reason I would assume that is
because Mr. Hardy was more excited about this candidate than I
had ever seen any client excited about any candidate in a final
interview setting. Mr. Bigot's performance was spectacular in the
interview. (emphasis added) (Adamson Tr. at 27:18-28:8).

\*    \*    \*

137.    Adamson testified that he could not be sure that Bigot was not hired because of

his race, it could have been because of bad checks or something else uncovered in a background

check. (Adamson Tr. at 26:9-27:17).

138.    Leftridge was also an Innovex District Manager who worked in a different region

than Adamson. (Adamson Tr. at 40:2-10; Deposition of Douglas Leftridge ("Leftridge Tr.") at

18:7-10).

139.    Adamson identified Leftridge in his Answers to Interrogatories as someone who

he believed was denied employment at Wyeth because of race. (Pl. Ex. 2 at No. 19; Adamson

Tr. at 40:2-6).

140.    Adamson testified that Leftridge was "denied fair participation in the

[employment] process" by Wyeth because of his race. (Adamson Tr. at 40:21-41:2).

141.    However, Adamson went on to admit that he did not even know if Leftridge had

ever even applied for a position at Wyeth. (Adamson Tr. at 43:23-44:6).

142.    Leftridge testified that he did not know who got the job he interviewed for and did not know if race discrimination had anything to do with the decision. (Leftridge Tr. 41:21-45:4).

143.    Leftridge specifically denied making the comments about racism at Wyeth that Adamson attributed to him. Adamson stated that:

> In 2000 and 2001, Mr. Leftridge commented that [paraphrasing] "Wyeth is a racist boys club."
>
> * * *
>
> Mr. Leftridge stated in the presence of their Innovex manager, Carl Buschmann, "Those guys (at Wyeth) are the most racist bunch of [expletives] you could ever meet. (Pl. Ex. 2 at No. 1 (4)).

Leftridge testified:

> Q:    Mr. Adamson testified that at some point you made a comment quote, something to this effect, "Wyeth is a racist boy's club." Do you recall ever making that comment?
>
> A:    Never. I don't recall making it. May I also say this. That I would never engage in that kind of conversation with anybody on a professional level, not in those terms. (Leftridge Tr. at 99:21-100:6).

144.    Leftridge testified that he had recommended two minority candidates to Wyeth and both were hired:

> Q:    -- your situation. Other than yourself, did you recommend any other minority candidates?
>
> A:    I did not.
>
> Q:    Okay. What position did you interview for at Wyeth?
>
> A:    District Manager. I want to go back to that last answer wasn't entirely accurate. I did suggest two and they were both hired.
>
> Q:    Who was that?
>
> A:    I don't recall the names, but there were two.
>
> Q:    Were they African Americans?

A:    They were.

Q:    Okay. So you recommended two African American candidates?

A:    Uh-huh.

Q:    And both of them were hired --

A:    Well, they actually --

Q:    -- by Wyeth?

A:    -- worked for me. So they were then switched over to Wyeth when a position came open in their territory. (Leftridge Tr. 38:2-22).

145.    Plaintiff has admitted repeatedly that his allegations against Defendants are based on assumptions and conclusions of a pattern and practice discrimination:

> And I know when I arrived at Wyeth, I observed that there were no blacks working anywhere in management or among the representatives. (Adamson Tr. at 66:14-17).

> \*    \*    \*

Q:    What's the basis for your - what's the factual basis for your assertion that it appeared the only way you might have secured permanent employment was by indirectly working with Innovex?

A:    Well, the facts would just be, as I said, as the suspicion grew, the reasons for that - and we've been through them. I'll try to repeat them to the best that I can right now. The failed interview with Ms. Diotalevi and the circumstances surrounding that interview, the way it took place; it was odd.

I think that then going into Mr. Winters' region and observing that there were no blacks at any of the meetings - and I went to a variety of the meetings. There were no blacks anywhere. And then I had a conversation or two or three with Ms. Glover about the pharmaceutical industry and Wyeth. And we discussed the fact that there were no blacks - that I saw no blacks. We discussed the fact that she saw no blacks, other than - she was the only black that she knew of during the time that she knew Mr. Winters, and then she was terminated.

And I thought it was odd that in a city that has a fair number of African-Americans, that Mr. Winters' only claim to fame, apparently based on the limited information that I had - as you

pointed out, I didn't know everything about the different years, how many he may have hired or fired - it appeared to me that from some point in 1999, somewhere in '94, '95 area, all the way up until July of '99, that maybe the only thing he did with respect to blacks was to fire one. And I thought that that would be consistent with the experience I had in the interview and, as I said, consistent with what I observed and the conversations I had with people in observing the absence of African-Americans in his region. (Adamson Tr. at 73:23-75:10).

\*    \*    \*

Q:    Do you believe because no black award recipients were at an award ceremony, that that's evidence of discrimination?

A:    Not necessarily by itself.

Q:    Do you think it is evidence of discrimination?

A:    I think probably it is. The huge number of individuals going up receiving awards, the absence of blacks would indicate no commitment, because I was looking, I remember, at a pretty large geographic area. It wasn't just Maine, for example. It was a whole lot of states with a whole lot of black folk.

Q:    And this was at the awards ceremony?

A:    Yes, at one of the big awards assemblies.

Q:    And there were a lot of African-Americans in the awards ceremony?

A:    No, there were not a lot, hardly any winning anything, is the point, which just indicates they haven't been up and running and in circulation, doing well in the job.

Q:    Do you think that's attributable to some form of race discrimination?

A:    I think it's part of the picture that I saw at Wyeth. It fits with a number of other things that we've talked about. (Adamson Tr. at 157:7-158:8).

146.    There has been ample evidence put forth by Plaintiff's own witnesses and himself that it is difficult to find qualified minority candidates in the New England region. (Adamson Tr. at 107:24-110:6, 117:22-118:3; Pl. Ex. 1 at 199:15-201:10; Winters Ex. 25).

147.    Plaintiff himself never hired any minority candidates while he was a District Manager for Innovex on the Wyeth contract, and only proposed one minority candidate during that time, Bigot. (Adamson Tr. at 90:19-91:4).

**Winters' Record on Recruitment/Selection**

148.    Prior to the July 1999-June 2000 performance appraisal period, Winters always received a "meets" or "exceeds" expectations rating in the "Recruitment/Selection" category of his employment review. (Winters Tr. at 187:24-188:7).

149.    In the July 1999 - June 2000 performance appraisal period, Winters received a "Below Expectations" rating in several categories, based on his Area's sales performance including: Results Orientation; Coaching/Leadership; and Recruitment/Selection. (Winters Ex. 2 at Wyeth 00673; Winters Tr. at 11:6-14:20).

150.    Adamson does not state any claims for failure to hire during the July 1999 - June 2000 period. (Amended Complaint).

Respectfully submitted,

WYETH PHARMACEUTICALS
and ROBERT WINTERS

By their attorneys,

Donald W. Schroeder, BBO #646700
Mintz, Levin, Cohn, Ferris, Glovsky,
  and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Dated: March 31, 2005