UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____
                                        )
KENNETH ADAMSON                         )
    Plaintiff                           )
                                        )
v.                                      )
                                        )
WYETH PHARMACEUTICALS f/n/a             )   C.A. NO. 04-CV-11623-DPW
WYETH-AYERST PHARMACEUTICALS            )
    Defendant                           )
                                        )
ROBERT WINTERS                          )
    Defendant                           )
_____)

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE OF COURT TO FILE A POST-HEARING REPLY TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On August 5, 2005, the Honorable Douglas P. Woodlock heard oral arguments for and in opposition to summary judgment in an employment discrimination suit brought by Kenneth Adamson ("Plaintiff"), pursuant to M.G.L. c. 151B, against defendants' Wyeth Pharmaceuticals f/n/a Wyeth-Ayerst Pharmaceuticals ("Wyeth") and Robert Winters ("Winters") (collectively "Defendants").

The parties have filed numerous exhibits, extensive statements of proposed contested and uncontested material facts,[1] and lengthy memoranda of law in support of their respective positions. At the conclusion of the hearing, Defendants' summary judgment motion was taken under advisement of the Court.

---

[1] Of the 150 proposed undisputed facts offered by Defendants, more than half (88) are fully or partially contested by Plaintiff. In contrast, the summary judgment record, excluding representations of opposing counsel, indicates that none of Plaintiff's 54 additional undisputed facts is in dispute. Pursuant to Local Rule 56.1, to the extent that Plaintiff's additional material facts are unopposed by Defendants, such facts should be deemed admitted for the purpose of summary judgment.

The following is a rebuttal to Defendants' oral arguments concerning Plaintiff's pattern and practice case. This memorandum focuses on disputed facts that support Plaintiff's contention that Defendants disparately treated him, in part, by maintaining an unlawful discriminatory personnel recruitment and selection practice that systematically excluded African American and other minorities from legitimately competing for sales and sales management positions, particularly in Mr. Winters' region of the country (Area 11).

## I. PLAINTIFF'S "PATTERN AND PRACTICE" CASE

### A. Relevant Case Law

Defendants are entitled to summary judgment if they can produce a "credible" evidence to show that no genuine issue of material facts exists concerning Plaintiff's failure to obtain permanent employment at Wyeth. See Wheelock College v. Massachusetts Com'n., Etc., 371 Mass. 130, Mass. 355 N.E.2d 309, 311 (1976) ("We . . . accept the principle, expressed in the better reasoned Federal cases dealing with (circumstantial proof), that an employer must not give a lawful reason or reasons for its employment decision but also must produce **credible** [emphasis added] evidence to show that the reason or reasons advanced were the real reasons.").

It is well-settled Massachusetts law that in a disparate treatment case involving employment discrimination under M.G.L. c. 151B, a continuing violation may exist if an employer's personnel decisions based on a facially neutral practice or policy systematically adversely affect a protected class. See Tan v. Stonehill College, 23 MDLR 39, 46 (2001), affirmed 24 MDLR 347 (2002), citing Local 1037 v. Com'n Against Discrimination, 406 Mass. 515, 521-23, 549 N.E.2d 97 (Mass. 1990); Beldo v. University of Massachusetts at Boston, 20 MDLR 105, 111 (1998).[2]

---

[2] See Plaintiff's Motion And Memorandum Of Law In Support Of His Opposition To Summary Judgment ("Opposition") at n.9.

Parenthetically, it is equally settled that Massachusetts courts, in "liberally construing" §9 of the above statute, will give deference to the decisional law of the Massachusetts Commission Against Discrimination ("MCAD") and to the latter's "rule-making authority." See Clifton v. Mass. Bay Transp. Auth., 62 Mass.App.Ct. 164, 815 N.E.2d 614, 620 (Mass.App.Ct. 2004) (internal citations omitted).

The Tan and Beldo cases are based on the Massachusetts Supreme Judicial Court's seminal decision in the Lynn case in which female teachers successfully challenged a discriminatory albeit facially neutral seniority policy that adversely affected pregnant employees. Local 1037 v. Com'n Against Discrimination supra. Such a policy was held discriminatory and constituted a daily, continuing violation. Id. at 521. "In clarifying further its position on the continuing violation doctrine in these circumstances, the Court, in dicta, opined as follows:

> The commission has been charged with the task of combating discrimination in the Commonwealth, and pursuant to its statutory powers, has developed the continuing violation rule to assist in carrying out its legislative mandate. To limit the continuing violation rule to the interpretation of the union (appellant) would be to strip the rule of its vitality, while allowing the dead hand of past discrimination to reach out to revisit illegal discrimination upon its past victims again and again. To this we cannot agree.

Id. at 523.

In Tan, the MCAD held that a private college's long-standing compensation practice of financially rewarding its professors based on overall teaching experience, seniority, and rank – i.e., facially neutral factors - had an adverse discriminatory effect on an Asian college professor's (the only non-Caucasian in the Mathematics Department) terms, conditions, or privileges of employment. Supra at 46, 47. In Beldo, the MCAD held that an employer's continuous failure to investigate and rectify

repeated allegations of race discrimination was tantamount to an "institution-wide 'systemic' practice of discrimination." Supra at 111.

      B.    <u>Defendants' Justification of Plaintiff's Rejection for Employment Lacks Merit</u>

At issue is whether Defendants' recruitment and selection practices had a discriminatory effect on Plaintiff's multiple attempts to gain full-time employment at Wyeth, especially in Area 11.

In a light construed most favorably to Plaintiff, the summary judgment record contains ample admissible evidence to demonstrate that such practices historically have resulted in the lack of a diverse sales force at entry level and first supervisory level positions in Defendants' workplace.[3] Such evidence contains multiple forms of circumstantial proof, including, but not limited to testimonial evidence of: a) race discrimination experienced by another qualified African American candidate (Douglas Leftridge),[4] b) Defendants' resistance to Plaintiff's attempt to hire Fred Bigot (a Black Haitian candidate) as an Innovex Sales Representative,[5] c) sex discrimination experienced by an African American female subordinate of Mr. Winters (Janice Glover);[6]
d) anecdotal evidence demonstrating a lack of diversity not only in Mr. Winters' region, but in the mid-Atlantic states (Zone 1);[7] and e) admissions by Mr. Winters and his former subordinate, Claudia

---

[3] Supra.

[4] See Plaintiff's LR 56.1 Statement Of Disputed And Undisputed Material Facts In Support Of His Opposition To Defendants' Motion For Summary Judgment ("P-SOF ¶__"), and, in particular, P-SOF ¶¶140, 142, 184).

[5] See P-SOF ¶¶135-37, 194.

[6] See P-SOF¶¶187-88.

[7] See P-SOF n9 and ¶¶187, 189.

- 4 -

Diotalevi, that neither had hired an African American District Manager nor an African American Sales Representative in the relevant time period.[8]

Defendants urge the Court to ignore these facts, arguing instead, for example, that the negative experiences of Janice Glover are irrelevant since Wyeth terminated her for cause and that Wyeth's rejection of Plaintiff for the Sales Representative position in 1999 and the Area Marketing position in 2001 was unrelated to Mr. Winters' involvement in the decision-making process.  Defendants contend that Plaintiff's multiple rejections of employment in a span of less than three years – with all but one rejection occurring in a span of approximately seven months - were allegedly attributable to his poor performance at his interviews and inferior qualifications compared to other candidates and, in any event, not due to a pattern and practice of discrimination.[9]  Such arguments, however, are based on a mischaracterization or a disregard of the relevant facts, based on the testimony of current employees beholden to Wyeth, and contrary to the substantive Massachusetts law on summary judgment.  Since Plaintiff has produced sufficient evidence to not only demonstrate a prima facie case of discrimination in Counts I and II, but also show that Defendants' justification for their rejection of his candidacy for employment is pretextual, summary judgment for Defendants is inappropriate.  See Blare v. Husky Injection Molding Systems, 419 Mass. 437, 646 N.E.2d 111, 117 (Mass. 1995) ("The ultimate issue of discrimination, raised by the plaintiff's and defendant's conflicting evidence as to the defendant's motive, is not for the court to decide on the basis of affidavits, but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses.").

---

[8] See P-SOF n9 and ¶¶21, 193, 196.

[9] See P-SOF n15 and ¶¶87-100, 121.

1.    March 2001 and December 2001 Wyeth District Manager Positions

Defendants twice rejected Plaintiff as a candidate for employment as a District Manager, the first time in March 2001, or thereabout, and the second time in December 2001.[10] A genuine material issue exists as to why Plaintiff was rejected in each instance since his credentials were markedly superior to those of the other candidates, in terms of length of experience in the District Manager position under Mr. Winters, number of years in the pharmaceutical industry, and a strong record of successful sales management performance.[11]

In evaluating comparative evidence at the summary judgment stage, while federal courts may be guided by the axiom that they are not to serve as "super personnel departments," they must nevertheless endeavor to scrutinize such evidence carefully in order to look for possible discriminatory intent underlying the reasonableness of the employer's adverse business decisions  See Loeb v. Textron, Inc., 600 F.2d 1003 at n.6 (1st Cir. 1979) ("[t]he more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one"); Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 825 N.E.2d 522, 541 (2005) (a lower court's task is not to evaluate the soundness of an employer's justification for its personnel decisions, but to ensure that the employer's decision making does not mask discriminatory intent); see also Chief Justice for Admin. and Management of the Trial Court, 439 Mass. 729, 725 (2003) ("Because hiring decisions are seldom made for a single reason, discriminatory intent and nondiscriminatory motives may coexist in the mind of a decision maker.  Thus, even when nondiscriminatory reasons play some role in a decision not to hire a particular applicant, that decision may still be unlawful if

---

[10] See P-SOF ¶¶65, 101-24.

[11] See P-SOF ¶¶62-65, 125-130, 186.

discriminatory animus was a "material and important ingredient" in the decision-making calculus.") (citation omitted); compare Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions.").

Defendants' selection of Patrick Daly as a Wyeth District Manager in March 2001 is a crystal clear example that calls into question Wyeth's and Winters' motivation for selecting this candidate over Mr. Adamson (or, for that matter, Mr. Leftridge) and whether Defendants' justification was pretextual, given the sequence of events leading up to the exclusion of Mr. Adamson from the interview process, in addition to Mr. Daly's relative inexperience in the pharmaceutical industry and track record as a District Manager, his failure to meet the minimum qualifications of the Sales Representative under the Wyeth/Innovex contract, and his failure to disclose in his job application that he had previously been rejected for employment by Wyeth.[12] Whether the real reason why Mr. Winters excluded Plaintiff from initial consideration as a District Manager in the spring expansion ultimately hinges on whether his version of facts is to be believed over Plaintiff's (i.e., his apparent misunderstanding of Plaintiff's career goals in a prior conversation versus Plaintiff's claim of discriminatory intent). Because of the "he said, she said" nature of the communication, such an assessment requires a determination of each witness' credibility by a jury, not the Court.

As for the December 2001 District Manager position, Defendants claim that because Plaintiff failed his interview with Mr. Winters, he was not offered the position. Their justification for this personnel decision, however, lacks muster in light of the fact that Plaintiff had passed a previous

---

[12] See e.g. P-SOF ¶¶62, 142, 155-181; see also Appendix Of Affidavits And Deposition Exhibits In Support Of Defendant's (sic) Motion For Summary Judgment, and, in particular, Winters' Exhibit 23 (Bates No. Wyeth 01301); Appendix Of Deposition Testimony In Support Of Defendants' Motion For Summary Judgment, and, in particular, Daly's deposition transcript at 20:10-14, 24:15-27:21.

interview with Mr. Winters for the Innovex District Manager position, demonstrated increasing success in managing his sales team's promotion of Wyeth products in Area 11, and received no major criticisms from Mr. Winters a few months prior regarding his performance or embrace of Wyeth's corporate culture as an Innovex Manager in Area 11.[13]  Although Plaintiff was able to sell Wyeth's products successfully, Defendants contend that he was unable to ultimately sell himself to Mr. Winters for a permanent position.  Whether Defendants' justification masks race discrimination is an issue for a jury.

With respect to the relevance of the adverse experiences of Mr. Leftridge and Ms. Glover at Wyeth, such corroborative evidence is highly probative on the issue of discriminatory intent, under federal law.  See Conway v. Electro Switch, Corp., 825 F.2d 593, 597-98 (1st Cir. 1987) (evidence of a "corporate state-of-mind or a discriminatory atmosphere" is "relevant to the question of discriminatory motive in considering a discriminatory claim . . . (and) (e)vidence of institutional state of mind may be presented for the consideration of the trier-of-fact because an employer's willingness to consider such impermissible factors such as race . . while engaging in one set of presumably neutral employment decisions . . . might tend to support an inference that such impermissible considerations may have entered into another area of ostensibly neutral employment decisions [such as] . . . an employee's termination").

Lastly, the fact that Plaintiff declined to pursue a lower level position after his last rejection is of no consequence, despite opposing counsel's protestation to the contrary, since Plaintiff had given up hope of rectifying his employment dispute and refused to be embarrassed and humiliated any further by

---

[13] See P-SOF ¶¶9, 42, 171; see also Plaintiff's Exhibit 39 and Defendants' deposition appendix, and, in particular, Winters' deposition transcript at 223:3-19 (according to Defendants' September 5, 2002 position statement to the MCAD, other than Mr. Winters, for example, having had "some concerns regarding Mr. Adamson's lack of communication with him" Mr. Winters concedes that his concerns about Mr. Adamson's management style were "resolved" after their "one-on-one" meeting in September 2001).  Finally, the summary judgment record is devoid of credible evidence which demonstrates that Defendants, prior to this litigation, had any problems with Plaintiff learning and applying the "five fundamentals and the four attributes" of the northeast zone.

Defendants.[14] See Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 750 N.E.2d 928, 942 (Mass. 2001) (under Massachusetts law, a plaintiff's knowledge of the "hopelessness of her environment" allows a plaintiff to litigate otherwise time-barred acts unless the delay was considered unreasonable under an objective standard).

      2.      Wyeth's 1999 Sales Representative Position

Plaintiff contends that Defendants' personnel recruitment and selection practices in 1999 systematically excluded qualified African Americans and other minorities from consideration, since Defendants made no serious effort to target minority applicants in Zone 1.

Plaintiff has produced persuasive evidence of discriminatory intent. First, Sandra Close, Wyeth's Senior Field Sales Strategic Staffing Representative, admits that Area 11 historically has been problematic recruiting diversity candidates.[15] Second, Mr. Winters' annual performance evaluation for the 1999/2000 period clearly shows that, according to his manager, he failed to recruit a diversified workforce, as did Mr. Roy Hammac, one of the other six Area Business Directors in Zone 1.[16] Third, it is undisputed by Mr. Winters and his subordinate, Claudia Diotalevi, by their own admissions, that they had lengthy histories of not hiring African Americans in sales positions.[17] Moreover, Mr. Winters' Area earned the dubious distinction during this period of being the <u>only</u> area in the entire country not

---

[14] See First Amended Complaint at ¶21.

[15] See P-SOF ¶192.

[16] See P-SOF ¶¶ 183, 196; see also Defendants' Exhibit Nos. 2 (Bates No. Wyeth 00659) and Plaintiff's Exhibits In Support Of His Opposition To Defendants' Motion For Summary Judgment, and, in particular, Exhibit No. 31 (Bates No. Wyeth 01937).

[17] See n7 supra.

hiring <u>any</u> minorities.[18] Fourth, Ms. Glover (who subsequent to Wyeth terminating her established a career in Human Resources Management) testified that Wyeth did not proactively attempt to hire more minorities, such as doing recruiting in any of the minority communities.[19] Fifth, when Wyeth finally paid attention to diversifying its Field Sales force in the 2001 expansion,[20] eight minorities were hired between February 1, 2001 and April 16, 2001 – with only a $20,000.00 expenditure in diversity initiatives and the support of an in-house corporate recruiter (Sandra Close).[21] According to Mr. Winters, prior to 2001, no similar initiatives were ever utilized by Wyeth since he became a Business Director in Area 11.[22]

---

[18] <u>See</u> Defendants' exhibits, and, in particular, Winters Exhibit No. 2 (Bates No. 00673).

[19] <u>See</u> P-SOF ¶189.

[20] The circumstances underlying the reason for Wyeth's diversity initiative remain unclear, since it has refused to produce documents or testimony concerning its affirmative action plan. For example, Eugene Sackett, Director of Human Resources for Employee Relations, was prevented by opposing counsel from testifying on this subject based on the doctrine of "self-critical analysis." <u>See</u> Sackett deposition at 30-33; <u>see</u> <u>also</u> Boswell's deposition at 50-55; Plaintiff's Exhibit No. 18 (Wyeth's general objections to interrogatories and answer to interrogatory nos. 7, 21); Plaintiff's Exhibit No. 22 (Wyeth's general objections to document requests and responses to document requests 22-24).

However, this common law privilege has never been recognized by Massachusetts courts and hence is inapplicable to the case at bar. <u>Massachusetts Bay Transportation Authority v. Deliotte & Touche</u>, 5 Mass.L.Rep. 61, 1996 Mass.Super. LEXIS 586, at *3 (Suffolk Super. Ct., March 15, 1996) ("this privilege has neither been adopted by the courts of Massachusetts nor has it been statutorily enacted by the legislature"); compare <u>O'Connor v. Chrysler Corporation</u>, 86 F.R.D. 211, 217-219 (D.Mass. 1980) (in a seminal federal civil rights case involving the self-critical analysis defense in a discovery dispute, the court, in accordance with certain guidelines, ordered the employer to produce its affirmative action plan, including data compilations on a nationwide basis, work-force statistics, nationwide statistics on hiring and applicant analysis, promotions, transfers and separations, minorities not in the working force, and other related documents).

Since Plaintiff originally commenced the civil action in Middlesex Superior Court, which Defendants later removed to federal district court on diversity grounds, black letter law dictates that in diversity cases which involve claims and defenses under state law, the state law governs any issue of privilege. <u>See</u> <u>Command Transp. Inc. v. Y.S. Line (U.S.A.) Corp.</u>, 116 F.R.D. 94, 95 (D.Mass. 1987). Accordingly, Wyeth's objections to producing testimonial or documentary discovery related its affirmative action plan are invalid.

[21] <u>See</u> P-SOF n9; <u>see also</u> Plaintiff's Exhibit No. 10; Defendants' exhibit appendix, and, in particular, Sackett Exhibit No. 3.

[22] <u>See</u> Defendants' deposition appendix, and, in particular, Winters' March 10, 2005 deposition transcript at

- 10 -

Lastly, Defendants argue at great length that Mr. Winters had absolutely no involvement with Ms. Diotalevi's rejection of Plaintiff in 1999 because Mr. Winters allegedly does get involved in screening candidates until the third interview.[23] Plaintiff's disputes Mr. Winters' claim and refers the Court to a similar circumstance in which Mr. Winters not only solicited feedback from his subordinate (Brad Hardy) regarding Mr. Hardy's interview with Fred Bigot, a Black Haitian Innovex job candidate first proposed by Plaintiff, but also later interjected himself in the selection process.[24] With respect to Ms. Diotalevi, Mr. Winters, as her direct supervisor, was required to evaluate her performance, including her efforts in recruiting and maintaining a diverse workforce.[25] Thus, a fair inference can be drawn that notwithstanding Mr. Winters' denial, he indeed participated in the personnel decision to reject Plaintiff, given his close style of supervision,[26] responsibilities as a supervisor of Ms. Diotalevi, poor track record for hiring a diversified sales force, and having exhibited similar conduct toward another minority candidate.

---

184:17-185:12.

[23] See P-SOF ¶35.

[24] See Defendants' exhibits, and, in particular, Winters Exhibit No. 1 at 230:8-234:10.

[25] See P-SOF ¶35.

[26] See e.g. P-SOF n4.

3.   Wyeth's Area Marketing Position

It is undisputed that when an Area Marketing position became available in November 2001 Plaintiff was not offered a job.[27] The record is unclear whether Wyeth hired an African American or a Caucasian during that time frame.

According to Nick Marmontello, former Wyeth Vice President of Business Planning and Analysis, Plaintiff, during his interview, "freaked out – actually started yelling at (Marmontello)."[28] Prior to Mr. Marmontello's summary judgment affidavit, Wyeth never made this accusation. In response thereto, Plaintiff's sworn affidavit directly rebutted Mr. Marmontello's representation.

Despite Mr. Winters' denial, the summary judgment record indicates that he was involved in the selection process in that he later spoke to Mr. Marmontello's subordinate, Matthew Dean, who had inquired about Plaintiff's employment history.[29] Mr. Winters disavowed any knowledge of Plaintiff's credentials and offered no recommendation to support his candidacy for the position.[30] Whether Mr. Winters' refusal to do so was based on a benign reason or attributable to his discriminatory animus toward Plaintiff due to the latter's race or was done with the intent to aid and abet Wyeth in a discriminatory practice toward African Americans are facts in dispute.

C.   Plaintiff's Statistical Evidence

In Sullivan v. Liberty Mutual Insurance Company, the Massachusetts Supreme Judicial Court held that statistical evidence has probative value to an employee's case at both the first and third stages of McDonnell Douglas analysis. See supra at 825 N.E.2d at 530 citing McDonnell Douglas Corp.

---

[27] See P-SOF ¶98.

[28] See P-SOF ¶94.

[29] See P-SOF ¶29.

[30] Id.

v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817 (1973); see also Sullivan id. n16 (discussing the value of statistical evidence in the prima facie case) and at 541 (the probative value of statistical evidence depends, for example, on whether the statistics can eliminate other explanations of disparate treatment of comparative groups).

Defendants' raw data demonstrate that not only did they repeatedly fail to hire minorities, but also that they interviewed relatively few in comparison to the hundreds of Caucasians screened and selected for employment.[31] A fair inference can be drawn from this data that the reason for this disparity was Defendants' discriminatory animus and their systematic practice of failing to employ simple strategies for attracting, developing, and promoting qualified minority candidates and not the availability (or alleged lack thereof) of an appropriate applicant pool.

The summary judgment record shows that Plaintiff was at all material times a highly qualified candidate for Wyeth's sales and marketing positions. Similarly, discovery revealed that despite Plaintiff's many years of successful experience in pharmaceutical sales and management and job performance on the Wyeth contract, Defendants consistently rejected him for employment in favor of Caucasians with credentials vastly inferior to his. Plaintiff's unrebutted statistical evidence, in combination with the totality of testimonial and documentary evidence on Defendants' recruitment and selection practices specific to Area 11 and sales positions prior to 2002, lend further credence to Plaintiff's claim that Defendants' justification for their rejection of applications for employment is a pretext for unlawful discrimination.

---

[31] See P-SOF n9.

II.    CONCLUSION

Defendants have failed to meet their burden under Fed.R.Civ.P. 56 of offering a credible and lawful explanation of their adverse personnel selection decisions toward Plaintiff. Since the summary judgment record contains many disputed material facts, judgment for Defendants is unwarranted. For the reasons cited above and his opposition, Plaintiff this Honorable Court to deny Defendants Motion for Summary Judgment.

Respectfully submitted on behalf of Plaintiff:

KENNETH ADAMSON

By his counsel:

_____
/s/ Howard Mark Fine, Esquire
Howard Mark Fine, Esquire
86 Sherman Street
Cambridge, MA  02140-3233
617-868-9200
B.B.O. No. 554671

Dated: August 15, 2005