UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


KENNETH ADAMSON,                  )
    Plaintiff,               )
                        )       CIVIL ACTION NO.
      v.                    )       04-11623-DPW
                        )
WYETH PHARMACEUTICALS f/n/a       )
WYETH-AYERST PHARMACEUTICALS,     )
and ROBERT WINTERS,               )
    Defendants.               )


MEMORANDUM AND ORDER
August 23, 2005


      Plaintiff Kenneth Adamson ("Adamson") brings this suit
against defendants Wyeth Pharmaceuticals ("Wyeth"), f/n/a Wyeth-
Ayerst Pharmaceuticals, and Robert Winters ("Winters") alleging
race discrimination in violation of Mass. Gen. Laws ch. 151B.[1]
Specifically, Adamson alleges that Wyeth and Winters
(collectively, "Defendants") failed to consider and/or hire him
for permanent managerial positions at Wyeth on the basis of his
race.  The defendants have moved for summary judgment.


**I. BACKGROUND**

_____

     [1]This court has jurisdiction over this action due to the
diversity of citizenship of the parties and the amount in
controversy, which exceeds $75,000.  28 U.S.C. § 1332.  In this
setting "[f]ederal courts sitting in diversity apply state
substantive law and federal procedural rules." Correia v.
Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003); Hanna v. Plumer, 380
U.S. 460, 465 (1965).

**A.   Facts**

The factual background, as drawn from the summary judgment record, is as follows:

1. <u>Adamson's Employment Experience</u>

a.   <u>1999 Pharmaceutical Representative Opening</u> - The relevant events begin in April 1999, when Adamson, who is African-American, applied for a position as a Pharmaceutical Representative at Wyeth. [Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("D 56.1") at ¶ 49; Plaintiff's Local Rule 56.1 Statement of Disputed and Undisputed Material Facts in Support of His Opposition to Defendants' Motion for Summary Judgment ("P 56.1") at n.15.]  Adamson had previously been employed by Merck, another major pharmaceutical company, where he worked as a sales representative for more than ten years. [P 56.1 at ¶ 51.]  After an initial interview with Wyeth District Manager Claudia Diotalevi ("Diotalevi"), Adamson had a second-round interview with Diotalevi and her fellow District Manager Margaret Glassman ("Glassman"). [P 56.1 at ¶ 51; D 56.1 ¶ 50.]  Following this interview, Diotalevi and Glassman decided to reject Adamson's application. [D 56.1 at ¶ 52.]  As a result, Adamson was not referred for a third and final interview with Winters, the Wyeth Area Business Director ("ABD") for Area 11 -- the geographic region comprising Massachusetts, New Hampshire, Rhode Island, Vermont, and Maine and falling within what Wyeth terms "Zone 1," a region encompassing most of the northeast and mid-Atlantic

regions of the United States. [D 56.1 at ¶¶ 52, 35, and 3.]

b.  <u>1999 Innovex Territory Representative Hiring</u> - In July 1999, Adamson was hired by Innovex, Inc. ("Innovex"), a company that provides pharmaceutical and biotechnology companies with a supplemental sales and marketing staff to promote their products. [P 56.1 at ¶ 7; D 56.1 at ¶ 7.]  Pursuant to a contract between Innovex and Wyeth, Innovex provided Wyeth with a supplemental sales force to market and sell its pharmaceutical drugs from January 1, 1999 to December 31, 2001. [D 56.1 at ¶ 8.]  Adamson was hired by Innovex as a Territory Representative -- <u>i.e.</u>, a pharmaceutical sales representative -- and assigned to the Wyeth contract. [D 56.1 at ¶ 9; P 56.1 at ¶ 9.]  In early 2000, within the span of two months, Innovex promoted Adamson first to an Area Field Trainer position and then to a District Manager job. [P 56.1 at ¶ 9.]  By this point, Adamson's direct supervisor at Innovex was Carl Buschmann ("Buschmann"), who was the Innovex Regional Sales Manager on the Wyeth contract. [P 56.1 at ¶ 10.]

c.  <u>Spring 2001 District Manager Openings</u> - In the spring of 2001, Wyeth expanded its field sales staff and, in conjunction therewith, had four District Manager openings in Area 11. [D 56.1 at ¶¶ 62-63; P 56.1 at ¶ 63.]  Responsibility for interviewing candidates for District Manager positions fell to Winters, as the ABD. [D 56.1 at ¶ 39.]  Furthermore, an ABD had to give his final approval before an employment offer could be extended for a District Manager position in his sales territory. [D 56.1 at ¶ 40.]  Accordingly, Winters was responsible both for interviewing

the candidates for the four District Manager openings in Area 11 and for approving those candidates who were hired.

Wyeth had a general practice of attempting to recruit internal candidates for open positions before looking to external sources for new employees. [D 56.1 at ¶ 38.]  Pursuant to this practice, two of the four Area 11 District Manager openings were filled by current Wyeth employees. [D 56.1 at ¶ 64.]  During a subsequent meeting of Wyeth ABDs, Dan Shepherd ("Shepherd") -- the Zone 1 Vice President and, therefore, Winters' boss -- asked the assembled ABDs if they had recommendations for the two remaining open District Manager positions in Area 11. [D 56.1 at ¶ 66.]  The only people recommended were two Innovex District Managers: Patrick Daly and Peter Rzewnicki. [D 56.1 at ¶ 68.]  Winters thereafter contacted Buschmann -- the Innovex Regional Sales Manager who supervised Daly and Rzewnicki, as well as Adamson -- to see whether the recommended employees would be interested in pursuing jobs with Wyeth. [D 56.1 at ¶ 69.]  Both Daly and Rzewnicki indicated their interest and interviews were scheduled for them with Winters. [D 56.1 at ¶ 69.]  The interviews took place on March 2, 2001.  [D 56.1 at ¶ 78.] Thereafter, Rzewnicki called Adamson to see if he had interviewed for the District Manager position as well. [D 56.1 at ¶ 78.] Rzewnicki informed Adamson that he had learned of the District Manager opening from Buschmann and that Daly was also interviewing for one of the jobs. [D 56.1 at ¶¶ 79-80.]

Following his phone conversation with Rzewnicki, Adamson

-4-

contacted Buschmann to express his displeasure at Winters for
failing to consider him for the District Manager job.  Upon
Buschmann's suggestion, Adamson voiced his concerns to the
Innovex Human Resources Representative. [P 56.1 at ¶ 65.]
Subsequently, Adamson spoke directly with Winters and informed
him of his interest in the District Manager positions. [P 56.1 at
¶ 65; D 56.1 at ¶ 85.]  Adamson was neither interviewed nor hired
for a District Manager position with Wyeth in March 2001.[2]

    d.    2001 Area Marketing Openings - On March 9, 2001,
Winters forwarded Adamson, via e-mail, an internal Wyeth listing
of a potential job opportunity with the company's Business
Planning & Analysis Department. [D 56.1 at ¶¶ 87-88.]  The
posting was for an Area Marketing position based at Wyeth's
headquarters in Pennsylvania. [D 56.1 at ¶ 87.]  The e-mail
message from Winters to Adamson read:

> Ken, here is an opportunity we discussed recently.  I would
> suggest you get Carl's support and have notification of your
> interest come from the Innovex channels.  Let me know if I
> can help in any way?

[D 56.1 at ¶ 88.]

    At the time Adamson interviewed for the Area Marketing
position in March 2001, no Area Marketing jobs were presently

---

[2]Defendants maintain that by the time Adamson spoke directly
to Winters, Daly and Rzewnicki had already been offered and had
accepted the two available District Manager positions. [D 56.1 at
¶¶ 85-86.]  Adamson contends that final offers of employment had
not yet been extended to Daly and Rzewnicki by the time he
complained to Buschmann and Winters regarding his not being
considered for the job and his interest in it. [P 56.1 at ¶ 81.]
This factual dispute is not material to resolution of the motion
before me.

available. [D 56.1 at ¶ 90.]  Nevertheless, because the Area
Marketing position was a transitional job from which employees
often quickly were promoted to other positions within the
company, Wyeth was in the practice of interviewing candidates for
the job on an ongoing basis, whether or not there was currently
an Area Marketing opening. [D 56.1 at ¶ 91.]  Adamson was
interviewed separately by Matthew Dean ("Dean"), who was then the
Assistant Vice President of Field Marketing at Wyeth, and Nick
Marmontello ("Marmontello"), whose title was Vice President,
Business Planning and Development. [D 56.1 at ¶ 93.]

    In November 2001, two Area Marketing positions became
available. [D 56.1 at ¶ 98.]  Neither position was offered to
Adamson. [D 56.1 at ¶ 98.]  Of the three external candidates, as
Adamson had been, who were hired for the Area Marketing position
between March 2001 and March 2002, two were African-American. [D
56.1 at ¶ 100.]

    e.  December 2001 District Manager Openings - Two District
Manager positions were scheduled to become available in Area 11 -
- specifically, in the Boston region -- in December 2001. [D 56.1
at ¶ 101.]  Winters interviewed four candidates for the jobs, two
of whom were current Wyeth managers, and two of whom -- Adamson
and Stephen Arena ("Arena") -- were Innovex District Managers
assigned to the Wyeth contract in the Boston area. [D 56.1 at ¶
101.]  Although Wyeth standard practice was to attempt to fill
positions with internal candidates before looking outside of the
company, Wyeth's contract with Innovex required that as the

contract drew to a close at the end of 2001, Wyeth would also interview Innovex employees who wanted to be considered for available job opportunities at Wyeth. [D 56.1 at ¶ 102.]

Adamson had an interview with Winters on November 14, 2001. [D 56.1 at ¶ 103.]  Winters was in the practice of writing out his interview questions in advance to ensure that he covered the same topics with each interviewee and thereby afforded each candidate the opportunity to speak to the same issues. [D 56.1 at ¶ 106.]  During his interview with Winters, Adamson discussed his creative and artistic abilities, the relevance of which to his qualifications for a District Manager position the parties dispute. [D 56.1 at ¶ 109; P 56.1 at ¶ 109.]  In response to a question by Winters, Adamson was unable to identify correctly the elements of two sales principles -- the "Five Fundamentals" and the "Four Attributes" -- that Wyeth ABDs and District Managers in Zone 1 had been asked to employ.[3] [D 56.1 at ¶ 112.]  Following the interview, Winters did not offer Adamson a District Manager position. [D 56.1 at ¶ 121.]

Arena, the other Innovex District Manager interviewed by Winters for the Wyeth District Manager position, also was not offered a job. [D 56.1 at ¶ 129.]  During his interview with Winters, Arena -- who is a white male -- was unable to enunciate

_____

[3]The "Five Fundamentals" were: (1) written itinerary to ensure targeting; (2) pre-call planning based on post-call notes; (3) know the literature; (4) follow the POA; and (5) close. [Winters Tr. at 123; Winters Ex. 56.]  The "Four Attributes" consisted of: (1) work ethic; (2) positive attitude; (3) integrity; and (4) the Five Fundamentals. [Id.]

precisely the "Five Fundaments" and the "Four Attributes." [D 56.1 at ¶ 128.]

f. <u>December 2001 Area Account Manager Opening</u> - In December 2001, Winters recommended Adamson for an Area Account Manager position, which was lower in rank than the District Manager position but was a job Adamson had expressed interest in via a November 14, 2001 letter to Sandra Close ("Close"), Wyeth's Senior Field Sales Strategic Staffing Representative. [D 56.1 at ¶¶ 122-23.]  Winters arranged for Adamson to be interviewed for the Area Account Manager job, but Adamson declined the interview for the lower level job because he thought it would be an unwise career move and lead to further "embarrassment, humiliation and mistreatment." [P 56.1 at ¶ 124; D 56.1 at ¶¶ 122, 124.]

2. <u>Allegations of Discrimination Against Others</u>

Adamson identified three other individuals -- Fred Bigot, Douglas Leftridge, and Janice Glover -- he claims were discriminated against by Wyeth on the basis of race.  Fred Bigot ("Bigot") was a Haitian candidate Adamson proposed at Innovex for assignment to the Wyeth contract. [D 56.1 at ¶ 133.]  Bigot was interviewed for the job by Adamson and a Wyeth employee, Brad Hardy, both of whom had reservations about Bigot after the interview. [D 56.1 at ¶ 134.]  Following the interview, allegations surfaced regarding Bigot and the use of "bad checks" and Bigot was not hired for the Wyeth job. [D 56.1 at ¶ 137; P 56.1 at ¶ 137.]  Adamson now alleges that the reason Bigot was not hired was race discrimination. [P 56.1 at ¶ 136.]

Like Adamson, Donald Leftridge ("Leftridge") was an African-American male and an Innovex District Manager, albeit in a different region than Adamson. [D 56.1 at ¶ 138.] Leftridge also had applied for but did not receive a District Manager position with Wyeth. [P 56.1 at ¶ 142.] One of Leftridge's District Manager colleagues at Innovex, George Summerson ("Summerson") -- a white male who was second in sales behind Leftridge for their region -- was interviewed for a Wyeth District Manager position by the same Wyeth ABD, Roy Hammac ("Hammac"), who interviewed Leftridge. Summerson was offered a District Manager position at Wyeth by Hammac, but for a different district than the one Leftridge interviewed for. [D 56.1 at ¶ 142.] During his deposition, Leftridge explained the basis for his belief that he did not receive a District Manager position at Wyeth because of his race. He testified that following a meeting in which Hammac had called upon Leftridge to assist in recruiting minority candidates to Wyeth, two Wyeth District Managers in attendance had made disparaging comments to the effect that Leftridge would be unable to find qualified, minority candidates. [P 56.1 at ¶ 142.] After Leftridge informed Hammac of the comments, Hammac did nothing to remedy the situation. [Id.] In further support of his allegation of discrimination, Leftridge testified about "the overall make-up of Wyeth Ayerst and in the industry they were referred to as 'whitest Ayerst' because of their lack of diversity in the whole company and the fact that whole districts that worked beside my folks had no diversity whatsoever. They

were all white.  Mostly female, but all white.  There wasn't another manager of color." [Id.]  But Leftridge also testified that during his tenure at Innovex, he had recommended two African-American employees of his at Innovex for positions at Wyeth and both had been hired. [D 56.1 at ¶ 144.]

Janice Glover ("Glover") was an African-American woman who worked as a Territory Representative for Wyeth in Winter's region between 1991 and 1997.  At some point, Glover detected a change in the way she was treated by one of her District Managers, both of whom were white, and hired an attorney to pursue her claim. [P 56.1 at ¶ 188.]  During her deposition testimony in the present case, Glover indicated that she thought the change in treatment was discriminatory, but in response to a question as to what category -- "race, gender, sexual" -- she had been discriminated upon, she did not give a specific answer. [Exhibit 32 of Plaintiff's Exhibits in Support of His Opposition to Defendants' Motion for Summary Judgment (hereinafter, "P Ex. #") at 70.] Glover also testified that shortly after she lodged her discrimination complaint with the Wyeth Human Resources department, the District Manager at issue was no longer supervising her and left Wyeth's employ, either voluntarily or as a result of having been terminated. [Id. at 71.]  With respect to Wyeth's hiring practices, Glover testified that "I don't believe that they had been discriminatory in their hiring practices, but I also don't believe that they proactively tried to hire more minorities." [Id. at 73.]  Finally, Glover testified that during

her tenure at Wyeth she was never subject to or witnessed any racially discriminatory conduct or statements by Winters. [Id. at 80-81.]

3. Diversity Hiring by Wyeth And Winters

Between 1995 and July 1999, Winters did not hire any minority candidates as District Managers. [Winters Tr. (3/10/2005) at 174- 177.]  Winters could not recall having recruited and hired any minority candidates for his sales force between 1986 and June 2000. [Winters Ex. 1 at 127-28.]  Winters estimated that between 1986 and 1992 he interviewed a total of five (5) minority candidates for positions at Wyeth. [Winters Ex. 1 at 134.]

At the time Adamson interviewed with Diotalevi for the Territory Representative position in 1999, there were ten or eleven Territory Representatives in her district, none of whom were African-American. [Diotalevi Tr. at 45.]  By Diotalevi's estimate, during her six years as a District Manager she interviewed between three and four African-American candidates, including Adamson, for Territory Representative positions at Wyeth. [Id.]  Diotalevi testified that she had never hired an African-American person for one of these positions.  When asked why, she responded that there was a "[l]ack of African-American candidates to interview." [Id.]

Statistics maintained by Winters' staff indicate that for the 1999 calendar year, 12 of the 456 candidates (i.e., 2.6% of the interviewee pool) interviewed for Territory Representative

positions in Area 11 were minorities. [Ex. P-11.]  From this pool
of candidates, only 25 people (<u>i.e.</u>, 5.5% of the interviewees)
were hired, none of them minorities. [<u>Id.</u>]  For the 2000 calendar
year, of the 119 applicants interviewed for Territory
Representative positions, two (2) were minorities  (<u>i.e.</u>, 1.7% of
the interviewee pool). [Ex. P-12.]  Seventeen people (14.3% of
the interviews) were hired as Territory Representatives; neither
minority candidate was hired. [<u>Id.</u>]

Winters received a "Below Expectations" rating in three
categories -- Results Orientation, Coaching/Leadership, and
Recruitment/Selection -- on his Wyeth employment review for the
performance period spanning July 1999 to June 2000; the review
was completed by Shepherd, Winters' supervisor. [D 56.1 at ¶
149.]  The "Performance Standards" section for
"Recruitment/Selection" listed the following: "Timely hiring
relative to goal, turnover rare, diversity management,
utilization of strategic staffing resources, use of rep referral
plan." [Appendix of Affidavits and Deposition Exhibits In Support
of Defendants' Motion for Summary Judgment ("D Appx."), Winters
Ex. 2 at Wyeth 00673.]  In the parallel "Performance Achieved"
section, Shepherd wrote:

> Bob's Area is unacceptable in terms of diversity recruitment
> and hiring.  There have been no minority hires in 1999-2000
> (only Area in the U.S.).  Hiring has been within suggested
> timeframes.  Overall quality of hires is acceptable, however
> quality must improve to move to a higher level of sales
> achievement.

[<u>Id.</u>]

Winters and others perceived it was difficult for Wyeth to identify and attract "quality diversity candidates" in Area 11. [Winters Tr. at 155-56; Ex. P-8 (memorandum by Close).]  In anticipation of its planned spring 2001 sales force expansion, in early 2001 Wyeth pursued a "Diversity Recruiting initiative" and deployed Close, the Senior Field Sales Strategic Staffing Representative, to assist in the effort for Zone 1, which included Area 11.  The approach utilized in Area 11 to attract diversity candidates included, _inter alia_, holding an open house, placing ads in major newspapers and "diversity publications" in the area, and advertising on radio stations "identified as having a large diversity listening audience." [Ex. P-9 (memorandum by Close).]  Pursuant to these efforts, between February 1, 2001 and April 16, 2001, Wyeth made eight minority hires in Area 11. [Ex. P-10.]  By the time the expansion effort ended at the close of April 2001, 22% of the total new hires made during the expansion were diversity candidates. [_Id._]

**B.    Procedural History**

Adamson commenced proceedings regarding his claims on or about April 24, 2002 by filing a charge with the Massachusetts Commission Against Discrimination ("MCAD"). [First Amended Complaint ("Compl.") at ¶ 22.]  On February 26, 2004, the MCAD dismissed the complaint without prejudice to Adamson pursuing a civil action against Defendants. [Compl. at ¶ 24.]  Adamson commenced a lawsuit against Defendants in state court on June 22, 2004, alleging both discrimination and retaliation.  Defendants

removed the case to this court on July 21, 2004. [D 56.1 at ¶¶
13-14.]   The retaliation claim, which Adamson had not raised in
the prior administrative proceedings before the MCAD, was
dismissed upon motion of Defendants. [D 56.1 at ¶ 16.]
Thereafter, Adamson filed a First Amended Complaint alleging in
Count One that Defendants had violated Mass. Gen. Laws ch. 151B,
§ 4(1) by discriminating against him on the basis of his race,
and in Count Two that Winters had aided and abetted Wyeth in its
illegal discrimination against Adamson in violation of Mass. Gen.
Laws ch. 151B, § 4(5).

## II. DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A fact is "material" if it has the "potential to affect
the outcome of the suit under the applicable law," Santiago-Ramos
v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.
2000) (internal quotation marks and citation omitted), and a
"genuine" issue is one supported by such evidence that "a
'reasonable jury, drawing favorable inferences,' could resolve it
in favor of the nonmoving party."  Triangle Trading Co. v. Robroy
Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v.

-14-

F.W. Morse & Co., 76 F.3d 413, 427 (1st Cir. 1996)).  When
deciding upon a motion for summary judgment, all facts are to be
viewed, and all inferences drawn, in the light most favorable to
the nonmoving party.  Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st
Cir. 2002).

A party seeking summary judgment must make a preliminary
showing that no genuine issue of material fact exists.  Nat'l
Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.
1995), cert. denied, 515 U.S. 1103 (1995).  Once the movant has
made such a showing, the nonmovant must point to specific facts
demonstrating that there is, indeed, a trialworthy issue.  Id.
The nonmovant "may not rest upon the mere allegations or denials
of the [moving] party's pleading," and instead "must set forth
specific facts showing that there is a genuine issue for trial."
Fed. R. Civ. P. 56(e).  If the nonmovant fails to make "a showing
sufficient to establish the existence of an element essential to
[its] case, and on which [it] will bear the burden of proof at
trial," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986),
summary judgment must enter against it.  Thus, "even in
employment discrimination cases, 'where elusive concepts such as
motive or intent are at issue,' this standard compels summary
judgment if the non-moving party 'rests merely upon conclusory
allegations, improbable inferences, and unsupported
speculation.'"  Feliciano de la Cruz v. El Conquistador Resort &

_Country Club_, 218 F.3d 1, 5 (1st Cir. 2000) (quoting _Medina-Munoz_
_v. R.J. Reynolds Tobacco Co._, 896 F.2d 5, 8 (1st Cir. 1990)).

**B.  Applicable Legal Framework**

Mass. Gen. Laws ch. 151B ("151B") provides, in relevant
part, that "[i]t shall be an unlawful practice . . . [f]or an
employer, by himself of his agent, because of the race . . . of
any individual to refuse to hire or employ or to bar or to
discharge from employment such individual or to discriminate
against such individual in compensation or in terms, conditions
or privileges of employment, unless based upon a bona fide
occupational qualification."  Mass. Gen. Laws ch. 151B, § 4(1).

The Massachusetts Supreme Judicial Court (the "SJC") has
held that an employee-plaintiff in a discrimination lawsuit must
establish the following four elements in order to prevail upon
his claim: membership in a protected class, harm, discriminatory
animus, and causation.  _Sullivan v. Liberty Mut. Ins. Co._, 444
Mass. 34, 39 (2005).  However, because direct evidence of the
latter two elements is rarely available, the SJC permits a
plaintiff to "establish one or both by indirect or circumstantial
evidence using the familiar three-stage, burden-shifting
paradigm" first articulated by the United States Supreme Court in
_McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 802-805 (1973),
and employed when resolving claims under federal anti-
discrimination law.  _Sullivan_, 444 Mass. at 39-40; _see also_
_Abramian v. President & Fellows of Harvard Coll._, 432 Mass. 107,
116 (2000) (employing _McDonnell Douglas_ framework in analyzing

claim under 151B).

In the first phase of the <u>McDonnell Douglas</u> formulation, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Sullivan</u>, 444 Mass. at 40. The plaintiff's burden at this stage is "not onerous." <u>Sullivan</u>, 444 Mass. at 40. In a failure to hire case such as this, the plaintiff establishes his prima facie case by adducing evidence that: "(1) []he is a member of a class protected by the State discrimination statute, (2) []he applied for an open position, (3) []he was not selected, and (4) h[is] employer sought to fill the position by hiring another individual with qualifications similar to [his]." <u>Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination</u>, 431 Mass. 655, 665 n.22 (2000) (citing <u>Wheelock Coll. v. Mass. Comm'n Against Discrimination</u>, 371 Mass. 130, 135 n.5 (1976)). Once the plaintiff makes this prima facie showing, he is entitled to a "legally mandatory, rebuttable presumption" that the employer unlawfully discriminated against him. <u>Sullivan</u>, 444 Mass. at 40 (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 n.7 (1981)).

The employer has the opportunity to rebut this presumption at the second stage of the <u>McDonnell Douglas</u> analysis, at which point the employer assumes the burden of production, <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Sullivan</u>, 444 Mass. at 50-51, although the burden of persuasion remains with the plaintiff throughout. <u>Wheelock</u>, 371 Mass. at 139 (holding that "[t]he burden of proof

of unlawful discrimination rests at all times with the complainant").  In order to rebut the presumption, the employer must articulate a "lawful reason or reasons for its employment decision" and also adduce "credible evidence to show that the reason or reasons advanced were the real reasons." Abramian, 432 Mass. at 116 (internal quotations and citation omitted).  Although the employer is not required to prove that its reasons were nondiscriminatory, "the defendant nevertheless retains the incentive to persuade the trier of fact that the employment decision was lawful.  Thus, the defendant normally will attempt to prove the factual basis for its explanation." Id. at 117 (quoting Burdine, 450 U.S. at 258).

If the employer fails to satisfy its burden of production at stage two, the plaintiff is entitled to judgment in his favor based upon the presumption of discrimination created by the evidence establishing his prima facie case.  See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 442 (1995).  If, however, the employer is successful "in carrying its burden of production, the McDonnell Douglas framework -- with its presumptions and burdens -- is no longer relevant." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993).  Accordingly, the presumption of discrimination drops out of the case and the plaintiff is left in the third and final stage with the burden that was his throughout -- that of showing illegal discrimination as the basis of the employer's decision.  McDonnell Douglas, 411 U.S. at 804; Abramian, 432 Mass. at 117.

-18-

Operating at this stage without the benefit of the presumption, it falls to the plaintiff to establish that the non-discriminatory justification offered by the defendant is mere pretext and that the true basis of its decision was discriminatory animus. McDonnell Douglas, 411 U.S. at 804; Sullivan, 444 Mass. at 54-55 (holding that the burden returns to the plaintiff "to establish that the basis of [the employer's] decision was unlawful discrimination 'by adducing evidence that the reasons given [by the employer] were mere pretexts to hide such discrimination'") (quoting Lewis v. Boston, 321 F.3d 207, 214 (1st Cir. 2003)).

Should the plaintiff establish that the reasons offered by the employer at the second stage were untrue, the jury would be permitted "to infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision, in the absence of direct evidence that the actual motivation was discrimination." Sullivan, 444 Mass. at 40 (quoting Knight v. Avon Prods., Inc., 438 Mass. 413, 422 (2003)).  The employer, however, "may counter the effect of this evidence by showing that, even if his articulated reason for the adverse action is untrue, he had no discriminatory intent, or that his action was based on a different, nondiscriminatory reason." Abramian, 432 Mass. at 118.  Throughout, the burden remains on the plaintiff to prove all of the "essential elements" of his discrimination claim, including that the defendant acted with discriminatory animus. See Sullivan, 444 Mass. at 40.

## C.  Application of McDonnell Douglas Framework

1. Adamson's Prima Facie Showing

As set forth above, to carry his initial burden of making a prima facie case of discriminatory failure to hire, Adamson must adduce evidence demonstrating that (1) he is a member of a protected class under 151B, (2) he applied for an open position with the defendant employer, (3) he was not hired for the position, and (4) the employer sought to fill the position by hiring another applicant with qualifications similar to his.  See Wynn & Wynn, 431 Mass. at 665 n.22 (citing Wheelock, 371 Mass. at 135 n.5).

Adamson alleges that Wyeth failed to hire or consider him for job opportunities due to discrimination on four instances: (1) in 1999, when he applied and was interviewed for a Territory Representative position, but was not offered the job; (2) in the spring of 2001, when Wyeth failed to inform him of or interview him for an available District Manager position; (3) in October or November 2001, when an Area Marketing position for which Adamson had interviewed in March 2001 became available and Adamson was not hired for the job; and (4) in December 2001, when Adamson was not hired for a District Manager position for which he had been interviewed in November 2001.  In response, Defendants contend that the first three of the alleged instances of discrimination must be dismissed because they are not timely, having occurred more than 180 days prior to Adamson filing his charge with MCAD. Furthermore, Defendants argue that Adamson cannot make out his

prima facie case with respect to the March 2001 District Manager
position and the 2001 Area Marketing position because those jobs
were not available at the time Adamson sought them, the former
having already been filled by the time Adamson expressed his
interest in interviewing for it and the latter not even becoming
available until approximately eight months after Adamson's
interview.  These arguments implicate substantive issues raised
by Defendants in their rebuttal of Adamson's prima facie case --
for example, whether Winters was involved in the 1999 hiring
decision, and also if the 2001 District Manager and Area
Marketing positions were even available at the time Adamson
expressed interest in pursuing them.  I will consider the
arguments in connection with the substantive issues.

     The burden Adamson faces at the first McDonnell Douglas
stage is not a steep one and "is not intended to be onerous."
Sullivan, 444 Mass. at 45.  Establishment of the prima facie case
serves the "important function" of "eliminat[ing] the most common
nondiscriminatory reasons for the plaintiff's rejection,"
Burdine, 450 U.S. at 253-54, i.e., the applicant's lack of
qualifications or the absence of job availability.  With respect
to the first two elements of his required showing, Adamson has
demonstrated that he is a member of a protected class and also
that he applied for the four positions in question.  There is no
dispute that the Territory Representative job Adamson interviewed
for in 1999 and the District Manager job he interviewed for in
late 2001 were available at the time he applied for them.  For

-21-

purposes of assessing Adamson's prima facie case, I will assume
that the District Manager position had not been finally filled by
the time Adamson expressed his interest therein to Winters in
March 2001.  With regard to the Area Marketing position, even
though there was no opening at the time of Adamson's March 2001
interview, the position was interviewed for on a rolling basis
and, accordingly, Adamson would have been among the pool of
candidates under consideration when an opening next arose.
Therefore, Adamson is deemed to have met his burden regarding the
second element of his prima facie case.

Except to the extent that there is a dispute over whether
the March 2001 District Manager and 2001 Area Marketing positions
were available at the time Adamson pursued them, Defendants do
not challenge the third and fourth elements of Adamson's prima
facie case.  Clearly, Adamson was not hired for any of the
positions complained of; Wyeth filled all of them by hiring some
other applicant.  Adamson alleges that the 1999 Territory
Representative, March 2001 District Manager, and December 2001
District Manager positions were filled by applicants who were
less qualified than he, thereby making out the fourth element of
his prima facie case for those three claims.  Adamson makes no
specific allegation regarding the qualifications of the eventual
hiree for the 2001 Area Marketing job.  He does, however, allege
that Defendants continued to seek applicants for the job and
observes that Wyeth's proffered basis for not hiring him was not
a problem with his qualifications, but rather allegations related

-22-

to his performance during the job interview.  Putting to one side whether substandard interview performance is somehow distinguishable from qualifications, drawing all inferences in favor of Adamson, as is required for summary judgment practice, and bearing in mind the relative ease of the plaintiff's path at this stage of the analysis, I find that Adamson has made out a prima facie case, albeit a circumstantial one, of discriminatory failure to hire by Defendants.

2. <u>Defendants' Rebuttal</u>

To meet their burden of production at the second stage of the <u>McDonnell Douglas</u> framework, Defendants may rebut the presumption of discrimination generated via Adamson's prima facie case by "articulating a lawful reason or reasons for its employment decision [and] producing credible evidence to show that the reason or reasons advanced were the real reasons." <u>Abramian</u>, 434 Mass. at 116 (internal quotation marks and citation omitted) (alteration in original).  For the reasons set forth below, Defendants have successfully met their burden and, thereby, rebutted the presumption of discrimination.

a.  <u>1999 Pharmaceutical Representative Opening</u> - Regarding the 1999 Representative job for which Adamson interviewed but was not hired, Defendants have adduced competent evidence demonstrating a non-discriminatory reason for the employment decision.  Specifically, Defendants point to deposition and affidavit testimony, respectively, from the two District Managers who interviewed Adamson for the job, Diotalevi and Glassman, in

which they explain their reasons for not hiring Adamson.
Diotalevi, who acknowledged in her deposition that the interview
"was a long time ago" and that she could not "remember every word
that went on" during it, testified that Adamson had given "vague
answers to the interview questions," demonstrated a "subtly
negative" attitude toward Merck, his prior employer, and did not
display the "sense of enthusiasm" she was looking for in a
Territory Representative for her district, particularly in
comparison with another candidate under consideration. [Diotalevi
Tr. at 56-57.]  When asked if Adamson was rude during the
interview, Diotalevi stated "I don't remember that he was rude."
[Diotalevi Tr. at 58-59.]  Diotalevi did not recall discussing
Adamson with Winters, who was her boss at the time. [Diotalevi
Tr. at 56-57.]

    In her affidavit, Glassman evidenced a more detailed memory
of the 1999 interview.  Regarding Adamson, she averred that she
"was not impressed with him on any level," that "[h]e came across
as being extremely arrogant and had an air of entitlement about
him," and that she "d[id] not believe he ever gave a satisfactory
and direct response to even one of the interview questions I
asked him." [Glassman Affidavit at p. 2.]  Glassman indicated
that she had particular concerns regarding Adamson's responses to
questions about his work experience at and departure from Merck.
[Id.]  Furthermore, his leaving of Merck and thereafter applying
for "the exact same position at a comparable company" (i.e.,
Wyeth) was an "unusual career choice" and raised a "red flag" for

-24-

Glassman. [Id.]  According to Glassman, when she and Diotalevi
inquired of Adamson regarding his departure from Merck he became
defensive and left her with the impression that he "felt we had
no right to inquire into his employment with Merck." [Id.]  Based
on the interview, Glassman concluded that Adamson "would not be a
good hire." [Id.]  After Diotalevi concurred in this analysis,
they decided not to refer him to a third-round interview with
Winters and did not offer him a job. [Id.]  Glassman testified
that Winters was not aware of Adamson's candidacy and played no
role in the decision not to hire him. [Id.]  Finally, Glassman
stated that the decision regarding Adamson's employment
application "was based on his performance and conduct in his
interview" and any allegation that it was due to race was "simply
untrue." [Id.]

Both Diotalevi and Glassman identified similar concerns
raised by Adamson's performance during his second-round job
interview, including his failure to provide direct answers to
questions, his "subtly negative" attitude toward his prior
employer and defensiveness upon being asked about why he left his
former job, and personality issues such as a lack of enthusiasm
and arrogance.  Through this showing, Defendants have both
satisfactorily articulated a non-discriminatory reason for the
decision not to hire Adamson as a Territory Representative in
1999 and supported the offered justification with admissible
evidence, thereby meeting their burden of production at stage two
of the McDonnell Douglas analysis as to this claim.  Furthermore,

Defendants have demonstrated that Winters had no involvement --
either direct or indirect -- in the decision not to hire Adamson
for the Territory Representative job and was not even made aware
of Adamson's application.

     b.  <u>Spring 2001 District Manager Openings</u> - Defendants'
showing regarding its non-discriminatory reason for not
interviewing or hiring Adamson for one of the available District
Manager positions in March 2001 relies upon two subsidiary
arguments, one speaking to why Defendants did not solicit Adamson
to interview for the job and the other regarding why he was not
interviewed once he expressed his interest in the job.

     First, Defendants offered unrebutted testimony from Winters
that when Wyeth ABDs were asked to provide recommendations of
Innovex District Managers who might be interested in filling the
two open Wyeth District Manager positions in Area 11 (Winters'
territory), Daly and Rzewnicki were the only candidates suggested
and Adamson's name was not mentioned. [Winters Tr. at 70-72;
Winters Ex. 1 at 67-69.]  Thereafter, Winters contacted Buschmann
-- the Innovex manager who supervised Daly, Rzewnicki, and
Adamson -- to inquire of him if Daly and Rzewnicki would be
interested in interviewing for the Wyeth positions. [Winters Tr.
at 70-72; Winters Ex. 1 at 69.]  Winters testified that Buschmann
confirmed the interest of the two candidates and did not
recommend Adamson for the District Manager position. [Winters Tr.
at 70-72; Winters Ex. 1 at 68-69.]  For his part, Buschmann
testified that although he had a clear memory of recommending

Adamson for the Area Marketing position discussed _infra_, he could not recall whether he did or did not recommend Adamson for the District Manager position in March 2001. [Buschmann Tr. at 64-66.]  Additionally, Winters testified that based upon a conversation he had directly with Adamson in February 2001, his understanding at the time was that Adamson's interest in pursuing employment with Wyeth was limited to seeking either a District Manager position in Virginia or an Area Marketing position. [Winters Tr. (3/10/2005) at 202-03; Winters Ex. 1 at 119-220.]

Defendants maintain that by the time Adamson contacted Winters in March 2001 to express his interest in employment as a District Manager, Daly and Rzewnicki had already been extended and accepted offers for the jobs and, thus, there was no open District Manager position for which Adamson could be considered. The evidentiary support for this chronology draws upon testimony from several sources.  Adamson testified that Rzewnicki had called him about the job in early to mid-March and that he called Winters "less than a week" after his conversation with Rzewnicki -- which he agreed would have been sometime in "mid- to late March" -- to express his interest in the job. [Adamson Tr. at 150-51.]  For his part, Rzewnicki testified that he spoke with Adamson about his interview the same day it took place, _i.e._, March 2, 2001. [Rzewnicki Tr. at 45.]  Rzewnicki further testified that he was offered the District Manager job "seven to ten days" after his March 2, 2001 interview -- _i.e._, sometime between March 9, 2001 and March 12, 2001 -- and that he accepted

-27-

the job on March 16th or 19th, following his mandatory drug test on March 13th. [Rzewnicki Tr. at 68-69.]  Because the job offers that were extended by Wyeth to Daly and Rzewnicki were contingent upon their passing a drug test and background check, the initial job offers were made by Winters some time prior to March 13, 2001. [Winters Tr. (2/17/2005) at 73; Winters Ex. 1 at 69; Daly Tr. at 69; Rzewnicki Tr. at 68-70.]

Defendants have offered a non-discriminatory explanation, supported by admissible evidence, for their not having asked Adamson to interview for the District Manager position when they solicited applications from his Innovex colleagues Daly and Rzewnicki.  As to the second prong of their argument, Defendants have offered a non-discriminatory reason for not interviewing Adamson once he expressed his interest in the jobs -- i.e., the positions had already been filled.  Defendants have adduced circumstantial evidence in support of this contention, namely Adamson's agreement during his deposition with the proposition that, given the timing of his conversation with Rzewnicki, he did not contact Winters to discuss the job until mid- to late March by which point, the evidence makes clear, job offers already had been extended, contingent upon routine, pre-employment procedures.

There is an inconsistency, however, between Adamson's and Rzewnicki's testimony regarding the date of their phone conversation -- Adamson claiming it was in early to mid-March and Rzewnicki recollecting that it was on March 2, 2001, the date of

his interview.  Adamson offered uncontroverted testimony that he called Winters "less than a week" after he spoke with Rzewnicki. Accordingly, for Defendants' chronology to carry the day, either Rzewnicki mis-remembered the date on which he called Adamson and Adamson's offered chronology stands (i.e., he spoke to Winters in mid- to late March 2001) or Adamson both mis-remembered the date of the call from Rzewnicki and also underestimated the interval between it and his subsequent call to Winters (i.e., the call from Rzewnicki was on March 2, 2001, but Adamson did not contact Winters until mid- to late March 2001).

In any event, Defendants have carried their burden of production by setting forth a non-discriminatory reason for their conduct and adducing credible evidence, albeit circumstantial and not immune to attack, to support the proffered justification.

c.  2001 Area Marketing Openings - As to the 2001 Area Marketing position, Defendants offer two explanations for Adamson not being hired.  First, Defendants claim that at the time of Adamson's March 2001 interview, there were no openings for the position, a job for which interviews were held on an ongoing basis whether or not a job was currently available.  More to the point, Defendants acknowledge that when several Area Marketing positions became available in November 2001, Adamson was not offered employment.  Defendants attribute this decision to Adamson's performance during his March 2001 interviews with Dean and Marmontello.  Specifically, Defendants point to affidavit testimony from Marmontello in which he recounted the substance of

-29-

his interview with Adamson, which had been preceded by an
interview between Dean and Adamson.

In his affidavit, Marmontello states that he was "initially
impressed with [Adamson's] presentation and background,"
including what appeared to be "significant pharmaceutical
experience" and his prior work experience with Merck, "one of the
major pharmaceutical companies." [Marmontello Affidavit at p.3.]
Nevertheless, Marmontello found it "odd" that "Adamson spent a
lot of time talking about his musical background -- more so than
anything else," and described trying to "steer him back" to a
discussion of the Area Marketing job. [Id.]  According to
Marmontello, when he asked Adamson about his career progression
later in the interview -- the inquiry, he observed, was prompted
by "something like his resume didn't seem to reflect the kind of
growth I would expect for a guy like him" -- "Adamson freaked out
-- he actually started yelling at me." [Id.]  Marmontello
continued, "Adamson was very agitated.  He was yelling words to
the effect of 'why does this always happen' and 'this is always
going to haunt me' and things like that.  I don't remember the
exact words, but that was the general flavor of what he said."
[Id.]

Marmontello did not inquire of Adamson regarding his
reaction and Adamson volunteered no explanation for it. [Id.]
However, based upon what he described as Adamson's "volatile and
defensive behavior," Marmontello concluded that Adamson was "not
a qualified candidate for any job with Wyeth." [Id.]  Marmontello

-30-

denied that race was a factor in the decision not to hire Adamson
for the Area Marketing job, and testified that of the three
external candidates hired for Area Marketing jobs by Wyeth
between March 2001 and March 2002, two were African-American.[4]
[Id.]  Finally, Marmontello stated that Winters "had no
involvement in the decisions regarding which candidates Mr. Dean
or myself hired for Area Marketing positions at any time" and
"had no input in my decision to reject Adamson's candidacy for an
Area Marketing position." [Id.]

Marmontello's description of his interview with Adamson is
consistent with certain patterns of behavior that emerge from the
reports of Adamson's three Wyeth interviews.  The common themes
are Adamson's defensive and hostile response to inquiries about
his departure from Merck, which arose during his interviews with
Diotalevi/Glassman and Marmontello, and his spending an
inordinate amount of time during the interviews discussing his
musical talents and creative strengths, a point both Winters and
Marmontello commented on and were perturbed by.  Accordingly, I
find that Defendants have set forth a "lawful reason or reasons
for its employment decision" not to hire Adamson for an Area
Marketing position in 2001 and have adduced admissible evidence

---

[4]Defendants also cite to Marmontello's affidavit in support
of their claim that when two Area Marketing jobs opened up in
November 2001, one of the vacancies was filled by an African-
American candidate.  Although there is no record evidence to
rebut this proposition, it is not directly supported by
Marmontello's affidavit, which speaks only to fact that two of
the three external hirees for the position between March 2001 and
March 2002 were African-American.

demonstrating the bona fides of the explanation.  Additionally, Defendants have demonstrated that Winters had no involvement in the decision not to hire Adamson for the Area Marketing job.

     d.  <u>December 2001 District Manager Openings</u> - With respect to the District Manager position for which Adamson applied in late 2001, Defendants attribute the decision not to hire Adamson to his poor performance during a November 14, 2001 interview with Winters.  Winters concluded that Adamson "was not someone that I felt comfortable putting in front of my people, as far as in charge of my people, because of that interview." [Winters Ex. 1 at 213.]  Winters testified that many of Adamson's answers to his questions -- a set of twenty-one questions Winters had written out in advance and posed to all applicants he interviewed for the job -- were unimpressive or irrelevant. [Winters Ex. 53; Winters Ex. 56; Winters Ex. 1 at 207-208, 251-252.]  In response to a question about why he wanted to work for Wyeth, Adamson spoke at length about his musical and creative abilities, as well as other topics Winters thought were irrelevant to the question posed. [Winters Ex. 1 at 207-09; Winters Ex. 53; Winters Ex. 56.] Winters contends that when he asked Adamson "what do you look for in a new hire?," Adamson listed "good physical shape" as among the desired attributes. [Winters Tr. at 253; Winters Ex. 53; Winters Ex. 56.]  Lastly, and Defendants claim most significantly, was the failure by Adamson to correctly recite the "Five Fundamentals" and "Four Attributes," sales principles upon which Winters claims to have trained Adamson and that Adamson, by

the time of his mid-November 2001 interview, should have been instructing his Territory Representatives regarding for approximately six months. [Winters Tr. 117-18, 120-22; Winters Ex. 1 at 211; Winters Ex. 37; Winters Ex. 40.]

Winters denied that his decision not to hire Adamson was based upon racial discrimination and observed during his deposition:

> Now, if Ken would've done good in that interview, then it would've been, for the lack of a better word here, it would have been a feather in my cap to hire a minority district manager. That would've been a big plus for me in the eyes of my management team, but after that interview, Ken was not someone that I could put in charge of my people.

[Winters Ex. 1 at 213.]

In further support of its non-discriminatory explanation for not hiring Adamson in December 2001 for a District Manager position, Defendants highlight the fact that another of the interviewees -- a white male with an undergraduate degree from an Ivy League college who, like Adamson, was an Innovex District Manager, albeit one with a longer tenure in that managerial position -- had also been rejected by Winters due, at least in part, to his failure to provide a satisfactory answer to the Five Fundamentals/Four Attributes question.[5] [Winters Tr. (3/10/2005) at 232-33.]

As to this fourth and final example of what Adamson claims

---

[5]Winters also testified that this candidate had provided "superficial" answers to some of the questions and seemed "a little green" to be a District Manager. [Winters Tr. (3/10/2005) at 232-33.]

was discriminatory failure to hire, Defendants have carried their burden of production and, thus, rebutted the presumption of discrimination.  Defendants provided a legitimate and non-discriminatory reason for their decision not to offer Adamson employment as a District Manager in December 2001 -- namely, his poor showing during the job interview -- and have set forth admissible evidence tending to show that this was the real reason for the decision, rather than a mere pretext designed to disguise discriminatory animus.

3. <u>Pretext</u>

Defendants having met their burden of production with respect to each of Adamson's four failure-to-hire claims, any presumption of discrimination falls from the case.  Adamson is left with the burden of showing that "the basis of the employer's decision was unlawful discrimination." <u>Abramian</u>, 432 Mass. at 117.  To do so in the face of the non-discriminatory justifications provided by Defendants -- and thereby to survive summary judgment -- he must adduce sufficient evidence from which a reasonable juror could conclude that the justifications "were mere pretexts to hide [unlawful] discrimination." <u>Sullivan</u>, 444 Mass. at 54-55 (internal quotation marks and citation omitted). One mechanism by which Adamson could satisfy this burden, at least to the extent necessary to defeat Defendants' motion for summary judgment, would be to demonstrate that the proffered

reasons for his not being hired are untrue.[6]  See Abramian, 432 Mass. at 119.  Other routes could entail production of circumstantial evidence, such as different treatment of similarly situated white job applicants, discriminatory comments being made by Wyeth decision-makers, or "statistical" evidence regarding the racial composition of Wyeth's work force.  See, e.g., Santiago-Ramos, 217 F.3d at 55 (determining that employee could attempt to demonstrate pretext by "show[ing] that discriminatory comments were made by the key decisionmaker or those in a position to influence"); Lipchitz v. Raytheon Co., 434 Mass. 493, 508-09 (2001) (holding that "statistical" evidence demonstrating that no women were employed in the corporate ranks of the defendant company during a certain time period could "properly be introduced in a disparate treatment case because to the extent they suggest that the highest ranks of an employer's organization are closed to members of a protected class, they may support an inference that the particular decision was tainted by an unlawful bias").

I undertake this final stage of the analysis sensitive to the SJC's warning that "summary judgment is disfavored in discrimination cases based on disparate treatment because the question of the employer's state of mind (discriminatory motive)

---

[6]Under Massachusetts law, a jury is permitted, but not required, "to infer discriminatory animus and causation from proof than an employer has advanced a false reason for the adverse employment decision, in the absence of direct evidence that the actual motivation was discrimination."  Sullivan, 444 Mass. 34, 40 (2005).

is 'elusive and rarely is established by other than circumstantial evidence.'" <u>Sullivan</u>, 444 Mass. at 38 (quoting <u>Blare</u>, 419 Mass. 439).  The SJC went on in <u>Sullivan</u>, however, to explain that there were circumstances under which it would uphold a grant of summary judgment in a disparate treatment case, specifically "where the plaintiff is unable to offer admissible evidence of the defendant's discriminatory intent, motive, or state of mind sufficient to carry the plaintiff's burdens and support a judgment in the plaintiff's favor." <u>Id.</u> at 39 (internal quotation marks and citations omitted).  This is just such a case.

To substantiate his claim of unlawful discrimination and rebut Defendants' non-discriminatory justifications for their employment decisions, Adamson advances two basic contentions, the first having to do with his qualifications and performance and the second implicating what he terms a "discriminatory corporate culture" at Wyeth "that is resistant to change."  For the reasons set forth below, neither line of reasoning is persuasive.

On the first front, Adamson alleges that he was equally or even more qualified than the candidates who were hired in his stead and that Defendants' contention that he performed poorly in his various interviews is "dubious" and "mendacious."  As to the former allegation, even assuming <u>arguendo</u> that Adamson was <u>more</u> qualified than the eventual hirees he would not be entitled to prevail on his claim if Defendants still had a nondiscriminatory reason for not hiring him.  After all, the task for the court is

-36-

not to assess the "soundness of [the employer's] decision making,
but to ensure it does not mask discriminatory animus." Sullivan,
444 Mass. at 56 (citing Mesnick v. General Elec. Co., 950 F.2d
816, 825 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992)
("Courts may not sit as super personnel departments, assessing
the merits -- or even the rationality -- of employers'
nondiscriminatory business decisions")).  In order to survive
Defendants' motion for summary judgment, therefore, Adamson must
do more than point to what he argues are his superior
qualifications vis-a-vis the candidates actually hired by Wyeth.
Attacking the business judgment of Defendants -- or lack thereof
-- in failing adequately to appreciate his qualifications is not
sufficient.  Adamson must make some showing supporting his
contention that the reason he, in particular, was not hired was
because of illegal discrimination.

     Defendants maintain that Adamson was not selected for the
1999 Territory Representative position, the 2001 Area Marketing
position, and the December 2001 District Manager position because
of his poor performance during his job interviews, conduct the
Wyeth interviewers concluded demonstrated that he was not
qualified for the jobs.  In attempting to rebut this legitimate,
non-discriminatory rationale for not hiring him by maintaining,
adamantly, that his interview performance was exemplary, Adamson
fundamentally misapprehends his burden.  The key question is not
whether a neutral and detached third-party observing the job
interviews would have afforded Adamson a passing or a failing

grade.  Instead, the inquiry turns on whether Defendants
perceived Adamson's performance as one warranting rejecting him
for employment and, furthermore, whether this perception was one
not based upon racial discrimination.  Adamson has adduced no
competent evidence that would enable a reasonable juror to
conclude that Defendants' stated non-discriminatory reason for
not hiring Adamson for these three positions -- the conclusion
that his poor interview performance indicated he was not
qualified or appropriate for the jobs -- was mere pretext masking
discriminatory animus.

     With respect to the March 2001 District Manager position,
Adamson has failed to point to any evidence demonstrating that
Defendants' stated reason for not inviting Adamson to apply for
one of the openings -- i.e., that the only external candidates
were invited to apply had been recommended by Wyeth managers --
was untrue or mere pretext.  A factual dispute does exist
regarding the sequence of events following Adamson being informed
of the openings by one of the interviewees and thereafter
contacting Winters to express his interest in the position.
Defendants maintain that by the time Adamson spoke to Winters the
positions were no longer available, job offers having already
been extended to and accepted by the candidates.  Adamson, on the
other hand, contends that when he spoke with Winters final offers
had not yet been made to the candidates.  Resolving this dispute,
as I do in this summary judgment context, in Adamson's favor,
however, carries him only to the threshold.  Even if Adamson

could demonstrate that final offers had not been made at the time of his conversation with Winters, to survive summary judgment he would still need to adduce admissible evidence of Defendants' "discriminatory intent, motive, or state of mind" sufficient to carry his burden of proof and support a judgment in his favor. Sullivan, 444 Mass. at 39.

Adamson continues his effort to demonstrate that Defendants' proffered reasons for not hiring him were mere pretext masking a discriminatory intent by pointing to a "discriminatory corporate culture" at Wyeth.  Specifically, Adamson highlights what he calls the "discriminatory experiences of Glover and Leftridge, Wyeth's reputation in the industry for lacking diversity (hence, its label 'whitest Ayerst'), as well as Defendants' rejection of a Haitian candidate (Fred Bigot)."  Additionally, Adamson contends that the "statistical evidence" regarding hiring for Territory Representatives in Area 11 in 1999 and 2000, and "Winters' and Diotalevi's admissions of failing to hire African Americans in Area 11, supports the inference that Defendants' selection practices were discriminatory toward Plaintiff and the protected class."

Adamson achieves no greater success with this approach. First, Glover's testimony about what Adamson frames as her "discriminatory experience" has little probative value in the context of Adamson's disparate treatment case.  Glover testified that at some point she detected a sudden change in the way one of her District Managers treated her.  She ascribed the change to

discrimination, but did not distinguish between race, gender, or
sexual discrimination.  After she reported the incident to Human
Resources at Wyeth, the District Manager was removed from
supervising her and Glover reporting having no further problems
of this sort.  This isolated incident does little to advance
Adamson's "discriminatory corporate culture" contention.
Furthermore, Glover testified that although she did not think
Wyeth "proactively tried to hire more minorities," she also did
not think the company "had been discriminatory in their hiring
practices."  Finally, Glover testified that in her seven-plus
years of working in Winters' region, she was never a witness to
or target of any racially discriminatory conduct or statements by
Winters.[7]

    As to Leftridge, the record evidence does not demonstrate --
as Adamson claims it does -- that Leftridge was passed over for
an available District Manager position in favor of a less
qualified white applicant.  Although the white candidate at issue
was hired for a District Manager position, the job was in a
different geographic district than the position Leftridge
interviewed for.  Leftridge did testify regarding discriminatory
comments made to him by two Wyeth District Managers with whom he

---

[7]Bigot's experience with Wyeth is no more helpful for
Adamson's case.  As it turned out, Adamson was one of the people
who interviewed Bigot for a position with Wyeth and he
acknowledged having had reservations about the candidate
following the interview.  Adamson provided no evidence that Bigot
was not offered employment because of his race and Adamson
testified that Bigot may not have been hired because of
allegations regarding his use of bad checks.

had contact while working for Innovex on the Wyeth contract, as well as the failure by the responsible Wyeth ABD to address his complaints regarding that matter.  Leftridge's testimony, however, that "in the industry" Wyeth was "referred to as 'whitest Ayerst' because of their lack of diversity in the whole company," is not admissible, however.

Although more probative than the examples of Glover and Bigot, Leftridge's testimony also does not operate to demonstrate that Wyeth either had a "discriminatory corporate culture" or that racial discrimination undergirded Defendants' failure to hire Adamson.  Examined closely, Leftridge's testimony primarily concerns conduct by two Wyeth District Managers and, specifically, isolated -- if quite offensive -- comments they made to the effect that he would be unable to identify qualified minority candidates for positions at Wyeth.  It bears mentioning that these comments followed a meeting in which the Wyeth ABD for the Area to which Leftridge was staffed by Innovex had asked Leftridge to assist Wyeth in recruiting minority or diversity candidates for positions at Wyeth, a request not consistent with Adamson's underlying allegation.  In any event, the comments of two individual Wyeth employees -- and even the failure of their ABD to respond adequately -- do not evidence a pervasive "corporate culture" of racism and discrimination.

Adamson has not demonstrated either a direct connection between the alleged "discriminatory experiences" of Glover and Leftridge and the discrimination he claims to have been subjected

to personally or a "pattern and practice of discrimination" by
Wyeth.  And, as to this last point, I turn now to the
"statistical evidence" offered by Adamson.

The dearth of African-American employees in Area 11,
especially in managerial positions, is uncontroverted.  However,
the statistics upon which Adamson relies shed little light on the
reason for the low percentage of minority employees.  Although
Adamson did not proffer any expert analysis of the statistics he
cites, even to non-expert eyes the limited explanatory value of
the data is manifest.  In 1999, only 5.5% of the applicants
interviewed for Territory Representative positions were hired.
Only 2.6% (12 out of 456) of the interviewees were diversity
candidates, none of whom were hired.  The data do not appear to
suggest that the diversity candidates were rejected in numbers
disproportionate to their representation in the pool of
interviewees.  In 2000, 14.3% of the interviewees were hired as
Territory Representatives.  Of the interviewees, 1.7% (2 out of
119) were diversity candidates, none of whom were hired.  This
data also fails to make a clear showing of discriminatory hiring
practices.

Although the evidence Adamson offers regarding the paucity
of minority employees or new hirees at Wyeth during the relevant
time assisted him in establishing his prima facie case, its
probative value is limited to the proposition that Wyeth's
workforce in Area 11 was not especially diverse.  Wyeth contends
that this result was due to historic difficulty in attracting

diversity candidates; Adamson, by contrast, ascribes race discrimination as the root cause. Adamson supports his thesis with the following reasoning: Wyeth had few if any diversity employees; I was a qualified diversity candidate who applied and was rejected for job opportunities at Wyeth on multiple occasions; Wyeth did not hire diversity candidates because of discrimination; accordingly, I was not hired because of discrimination. Repetition of the claim, however, does not itself constitute proof of the underlying proposition. Adamson adduces no competent evidence to support his allegation that the low numbers of diversity employees at Wyeth was due to race discrimination, as opposed to some non-discriminatory explanation such as comparatively few diversity applicants. Unable to establish his claim of company-wide discrimination, Adamason obtains no additional support for the contention that his personal experience was part of a "pattern and practice" of discrimination by Wyeth.

Having gained no ground by invoking bald statistics of an apparently non-diverse workforce, Adamson is left with his overarching burden of demonstrating that the reasons offered by Defendants for not hiring him were pretextual ones masking race discrimination. Adamson attempts to link the statistical evidence, his allegations regarding a discriminatory "corporate culture" at Wyeth, and his own experience of not being hired through the vector of Winters' performance in diversity hiring. As set forth above, for the year spanning July 1999 to June 2000,

Winters was assessed as falling "Below Expectations" by his
superiors at Wyeth with respect to recruiting diversity
candidates for positions.  In fact, Winters' Area 11 was the only
Wyeth Area in the country for which no minority hires were made
during the same time period.  But the evaluation did not allege
that the lack of diversity was due to discrimination.  Winters
and other Wyeth employees maintained that historically it had
been difficult to attract qualified diversity candidates in Area
11.  Adamson has adduced no evidence demonstrating that the lack
of diversity and, specifically, Winters' failing to hire a
diversity candidate for Area 11 during the year, was attributable
to racial discrimination.

In 2001, when Adamson twice sought employment in Area 11,
Wyeth undertook a "Diversity Recruiting" campaign pursuant to
which it employed a multi-pronged effort to recruit and hire
diversity candidates.  In a two-and-a-half month period, Wyeth
hired eight diversity candidates for positions in Area 11.
Although this particular recruiting initiative did not involve
the District Manager positions Adamson sought in Area 11, it does
tend to rebut Adamson's contention that Wyeth's hiring practices
were discriminatory.  More probative, however, is Winters'
unrebutted testimony that he would have been rewarded by his
superiors if he had hired Adamson precisely <u>because</u> Adamson was a
diversity candidate.  Nevertheless, because of Adamson's poor
interview performance, Winters concluded that he could not put
Adamson in a managerial position at Wyeth and elected not to hire

him, even though doing so also entailed passing up an opportunity to advance his own career.

Adamson has failed to rebut Defendants' proffered non-discriminatory reasons for not hiring him either by proving the falsity of the reasons or by showing them to be mere pretext for discriminatory animus.  I find that the evidence of record is insufficient, as a matter of law, to support Adamson's claim that Defendants did not hire him due to a discriminatory intent, motive, or state of mind.

### III. CONCLUSION

For the reasons set forth more fully above, Defendants' Motion for Summary Judgment is GRANTED.

/s/ Douglas P. Woodlock

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE